**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF DURHAM, NORTH CAROLINA,<br><br>　　　　Defendant. | Case No.  24-cv-838 |

## <u>MEMORANDUM IN SUPPORT OF JOINT MOTION<br>FOR PROVISIONAL APPROVAL AND ENTRY OF CONSENT DECREE</u>

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    PROCEDURAL BACKGROUND ..................................................................... 1

III.   FACTUAL BACKGROUND .............................................................................. 3

IV.   OVERVIEW OF THE CONSENT DECREE ................................................... 5

     A.     Injunctive Relief ..................................................................................... 5

     B.     Individual Relief .................................................................................... 5

          1.     Monetary Relief ......................................................................... 6

          2.     Priority Hiring Relief ................................................................. 6

     C.     Procedures for Entry and Implementation of the Consent Decree ............... 7

          1.     Fairness Hearing on the Terms of the Consent Decree ......................... 7

          2.     Fairness Hearing on Individual Relief .................................................. 8

     D.     Continuing Jurisdiction .......................................................................... 9

V.     ARGUMENT ................................................................................................... 10

     A.     Legal Standard ..................................................................................... 10

     B.     The Consent Decree Is Fair, Adequate, Reasonable, and Consistent with Federal Law. .................................................................................... 12

          1.     The United States Is Likely to Succeed on the Merits ......................... 12

          2.     The Consent Decree Provides Relief that Is Adequate and Appropriate Under Title VII. ............................................................... 17

          3.     The Stage of the Proceedings, the Absence of Collusion, and the Experience of Counsel Support Approval of the Consent Decree. ..... 20

          4.     The Consent Decree Provides for Two Hearings to Ensure Fairness .. 22

VI.   CONCLUSION ............................................................................................... 23

## I.    INTRODUCTION

Plaintiff United States of America ("United States") and Defendant City of Durham, North Carolina ("Durham" or "City") (collectively, "Parties") submit this Memorandum in Support of Joint Motion for Provisional Approval and Entry of Consent Decree ("Joint Motion"). The Parties request that the Court provisionally approve and enter the Consent Decree ("Decree") filed with the Joint Motion as Exhibit A, schedule a Fairness Hearing on the Terms of the Consent Decree, and stay all deadlines pending the Court's determination of whether to enter the Decree as a final order.

As set forth below, the Court should provisionally approve and enter the Decree because its terms are fair, adequate, and reasonable, and are not illegal, a product of collusion, or against the public interest. If entered, the Decree will resolve all of the United States' claims in this action, establish procedures for Durham's development and use of a lawful new selection device for hiring entry-level Firefighters that complies with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and provide appropriate individual relief in the form of monetary awards and priority hiring awards to qualified African-American applicants who were affected by the employment practices the United States challenged in this case.

## II.    PROCEDURAL BACKGROUND

On February 21, 2020, the United States notified Durham that it was opening an investigation to determine whether the Durham Fire Department ("DFD") violated Title VII by engaging in an unintended pattern or practice of discrimination against African-

American applicants for its entry-level Firefighter position related to the use of a facially neutral written hiring test. Throughout its investigation, the United States analyzed extensive documents and data related to DFD's hiring practices, including applicant scores on the written test and test development and validation materials. On January 30, 2024, the United States notified Durham that it concluded DFD was engaged in a pattern or practice of disparate impact discrimination in violation of Title VII.

The United States commenced this action on October 7, 2024, alleging that, since 2015 and continuing to the present, two of the City's uses of the Comprehensive Examination Battery ("CEB"), a standardized written examination developed by Fire and Police Selection, Inc. ("FPSI"), each had an unlawful, unintentional adverse impact on African-American applicants for the entry-level Firefighter job. *See* Compl. ¶ 1, Dkt. No. 1. The City used the CEB both as a pass/fail selection device and as a ranking device to determine which applicants get interviews.

Specifically, in its Complaint, the United States alleges that African-American applicants for the entry-level Firefighter position disproportionately failed this examination and were disproportionately not offered interviews because of their scores even if they passed. The United States further alleges that Durham's uses of the CEB have not been shown to be job related for the DFD entry-level Firefighter position and consistent with business necessity. The United States does not allege that Durham engaged in intentional discrimination against African-American candidates. Durham does

2

not admit to liability under Title VII.

The City has expressed a commitment to working with the United States to resolve the United States' allegations, and the Parties engaged in productive settlement negotiations during the spring and summer of 2024. The City Attorney's Office presented the negotiated Decree to Durham's City Council for approval on September 19, 2024, and the City Council authorized the City Manager to execute it that day. The Parties agree to the terms of the proposed Decree and to waive hearings and findings of fact and conclusions of law on all remaining issues, subject to the fairness hearings outlined below.

## III. FACTUAL BACKGROUND

For purposes of seeking provisional—and, ultimately, final—entry of the Consent Decree, the United States contends, and Durham does not dispute, the following.

Since 2015, the selection process for hiring entry-level Firefighters at DFD has included the CEB written exam. At all relevant times, Durham used applicants' scores on the CEB in at least two ways: First, applicants were required to obtain a passing score of 70 percent or better. Applicants who failed the written exam were removed from further consideration. Second, applicants who obtained a passing score of 70 percent or better on the written exam were required to be interviewed to proceed to the other steps in the selection process. In each hiring cycle, the City aimed to interview five times the number of applicants as the number of Firefighters it sought to hire. In cycles for which there

were more eligible applicants than interview slots available, the City ranked eligible applicants in order of their scores on the written exam and invited candidates to interview in order of their rank. Applicants who did not receive an invitation to interview were removed from further consideration.

From 2015 to the present, African-American applicants passed the written examination at a lower rate than white applicants. The difference between the pass rates of African-American and white applicants is statistically significant at more than 3 units of standard deviation when aggregating the years since 2015. Similarly, from 2015 to the present, African-American applicants were offered interviews based on their CEB score at a lower rate than white applicants. The difference between the invitation rates of African-American and white applicants is statistically significant at more than 3 units of standard deviation when aggregating the years since 2015.

Based on a calculation of the estimated number of African-American applicants who would have proceeded through the remaining parts of the hiring process if they had not been disqualified by the CEB, at least 16 additional African-American applicants would have been hired by the City since 2015 absent the unintentional disparate impact of the written examination.

When the United States notified Durham on January 30, 2024, of its conclusion that Durham was engaged in unlawful discrimination in violation of Title VII, Durham's uses of the CEB written exam were ongoing. Durham continued to administer and rely on

4

the written exam during the Parties' settlement discussions, and the applicants who most recently took the exam have not yet graduated from the DFD Academy and begun work as firefighters.

## IV.   OVERVIEW OF THE CONSENT DECREE

The Decree provides for individual and injunctive relief, two fairness hearings, and the continuing jurisdiction of the Court. Below is a summary of its central provisions.

### A.   Injunctive Relief

Under the Decree, the City will be enjoined from any further use of the CEB or any other selection device that results in adverse impact on African-American applicants and is not job related and consistent with business necessity. The City agrees to develop and administer a New Selection Device[1] to replace the CEB, Ex. A ¶¶ 40–51, and to provide the United States with information so that the United States may evaluate whether it complies with Title VII. *Id.* ¶¶ 41–42, 44, 46.

### B.   Individual Relief

The City agrees to provide individual relief to eligible claimants in the form of (1) monetary relief (*i.e.*, back pay) and/or (2) priority hiring relief, including non-competitive retroactive seniority and hiring bonuses in lieu of pension credits. *Id.* ¶¶ 52, 121–27. Both

---

[1] This memorandum adopts the definitions provided in the Decree. A "New Selection Device" is "any examination, test, requirement, or other criterion used by the City in place of the Challenged Written Exam…." Ex. A ¶ 10. A "claimant" is a person who submits an Interest-in-Relief Form. Ex. A ¶ 6.

5

forms of individual relief are remedial and will be awarded only to individuals who were disqualified from the selection process by the written exam but would otherwise have been eligible for hire.

### 1. Monetary Relief

The City will establish a Settlement Fund of $980,000 to be distributed to eligible claimants. *Id.* ¶ 53. A claimant is eligible for back pay if they: (1) are Black or African American; (2) either took and failed the written test, or failed to be invited to interview as a result of the claimant's score on the written test; and (3) met the minimum qualifications for employment at the time they were disqualified by the written test. *Id.* ¶ 62. The amount of back pay relief that each claimant receives will not exceed make-whole monetary relief and will be determined by the United States, subject to final approval of the Court, taking into account the date on which each claimant was disqualified from the selection process. *Id.* ¶ 66.

### 2. Priority Hiring Relief

The City will select up to 16 priority hires from the eligible claimants. *Id.* ¶ 104. A claimant is eligible for priority hiring relief if they: are eligible for monetary relief, as outlined above; and, in addition, meet the minimum qualifications for employment as a Firefighter in effect at the time they are completing DFD's new selection procedures. *Id.* ¶ 63. Importantly, the Decree does not require DFD to hire anyone who is unqualified to be a Firefighter. Rather, the City, under the Decree, will require all claimants eligible for

6

priority hiring relief to complete DFD's new selection procedures, and only eligible claimants who successfully pass all steps in that process will be hired. *Id.* ¶ 67. Said another way, the priority hires are screened in exactly the same manner as all other applicants.

Selected priority hires will receive: (1) an award of retroactive seniority; and (2) a hiring bonus in lieu of retroactive pension benefits*, id.* ¶ 108, in amounts corresponding to the year the claimant was first disqualified by the written test. *Id.* ¶¶ 121–27.

### C. Procedures for Entry and Implementation of the Consent Decree

The Decree, if provisionally approved, sets forth the following procedures and schedule for notice and two fairness hearings.

#### 1. *Fairness Hearing on the Terms of the Consent Decree*

The Parties respectfully request that the Court schedule a Fairness Hearing on the Terms of the Consent Decree no earlier than 130 days after provisionally approving the Decree. *Id.* ¶ 12.

Following provisional approval of the Decree, a claims administrator will send notice to all potentially eligible claimants informing them of the settlement, their right to object, and the date, time, and location of the initial fairness hearing. *Id.* ¶ 21; *see id.* App. A, B. Notice will also be provided to all interested persons and organizations, including current Firefighters and the Local 668, the Professional Fire Fighters of Durham. *Id.* ¶ 23. General notice will also be published on the City's website, DFD's

7

website, in the Durham Herald Sun, on the City's Facebook page, its X (formerly Twitter) page, and DFD's X page. *Id.* ¶ 24.

The United States will file with the Court all objections to the Decree and the Parties' responses. *Id.* ¶ 31. At the hearing, the Parties will respectfully request that the Court consider and resolve any objections to the terms of the Decree and, if it concludes that these terms are fair, adequate, reasonable, and lawful, approve and enter the Decree. *Id.* ¶ 32.

### 2. *Fairness Hearing on Individual Relief*

Following the entry of the Decree, the claims administrator will send notice to all potentially eligible claimants informing them of the Decree's entry and providing them with instructions for submitting an Interest-in-Relief Form. *Id.* ¶ 55; *see id.* App. C, D. The United States will review claimants' Interest-in-Relief Forms and file a Proposed Individual Relief Awards List with the Court and will simultaneously move the Court to hold a Fairness Hearing on Individual Relief to allow the Court to determine whether the proposed awards list should be approved. *Id.* ¶¶ 70–71.

Before the second fairness hearing, the claims administrator will send notice to claimants of the United States' preliminary determinations concerning their eligibility for individual relief and provide instructions on how to object to that determination. *Id.* ¶ 72; *see id.* App. E, F. The United States will file with the Court all objections to its determinations and the Parties' responses, including whether any awards should be

adjusted based on information provided in the objections. *Id.* ¶ 77. At the hearing, the Parties will respectfully request that the Court determine which, if any, objections to the Proposed Individual Relief Awards List are well-founded and then approve the list as submitted or request adjustment as appropriate. *Id.* ¶ 79.

Following the Court's approval, the claims administrator will send notice of individual relief awards to eligible claimants. *Id.* ¶ 83; *see id.* App. G. Claimants must then timely submit an Acceptance of Individual Relief Award and Release of Claims Form along with any applicable withholding tax forms. *Id.* ¶ 85; *see id.* App. H. The claims administrator will then issue monetary award checks, and Durham will provide instructions to eligible claimants on how to participate in the priority hiring selection process. *Id.* ¶¶ 94, 110.

**D.** **Continuing Jurisdiction**

The Decree provides that the Court will retain jurisdiction over this matter for the purpose of resolving any disputes that the Parties are unable to resolve informally or entering any orders that may be appropriate to implement the Decree. *Id.* ¶¶ 135, 140. Provided that there are no outstanding disputes before the Court, the Decree shall be dissolved no earlier than three years and six months following the final entry of the Decree, or later, if necessary, to assure completion of the following: (1) fulfillment of the Parties' obligations with respect to injunctive relief and the development and use of a lawful New Selection Device; (2) completion of the issuance of monetary award checks;

9

and (3) 30 days after the City provides the final report regarding priority hiring relief as required by the Decree. *Id.* ¶ 136.

## V.      ARGUMENT

### A.      Legal Standard

"In enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims." *Carson v. Am. Brands, Inc*., 450 U.S. 79, 88 n.14 (1981); *see also United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) ("In considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are encouraged."); *United States v. Baltimore Cnty., Md.*, 2021 WL 2000480, at *4 (D. Md. May 19, 2021) (noting that "in a Title VII pattern or practice suit, the court is guided by the general principle that settlements are encouraged under Title VII") (citations omitted).

For a pattern or practice suit brought under Title VII, such as this one, the Court "must satisfy itself that the agreement is fair, adequate, and reasonable and is not illegal, a product of collusion, or against the public interest." *L.J. v. Wilbon*, 633 F.3d 297, 311 (4th Cir. 2011) (internal quotation marks omitted) (quoting *North Carolina*, 180 F.3d at 581). In determining the fairness of a proposed agreement, courts should "weigh[] the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson*, 450 U.S. at 88 n.14; *see also North Carolina*, 180 F.3d at 581; *Baltimore Cnty.*, 2021 WL 2000480, at *4. When making this assessment, a

10

court is not required to conduct "a trial or a rehearsal of the trial," but it must still "ensure" that it reaches "an informed, just and reasoned decision.'" *North Carolina*, 180 F.3d at 581 (internal quotation marks omitted) (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172–73 (4th Cir. 1975)).[2]

In evaluating the fairness, adequacy, and reasonableness of a proposed agreement, courts also consider "the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement." *Id.* (quoting *Carson v. Am. Brands, Inc.*, 606 F.2d 420, 430 (4th Cir. 1979) (en banc) (Winter, J. dissenting), *adopted by Carson v. Am. Brands, Inc.*, 654 F.2d 300, 301 (4th Cir. 1981) (en banc) (per curiam)); *accord Baltimore Cnty.*, 2021 WL 2000480, at *4. A court should afford "great weight" to the opinion of competent counsel, absent any showing of collusion or bad faith. *Carson*, 606 F.2d at 430 (4th Cir. 1979). Moreover, "where a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed

---

[2] The Fourth Circuit has not addressed whether the "strong basis in evidence" standard established in *Ricci v. DeStefano* applies to Title VII consent decrees or settlement agreements. 557 U.S. 557, 584 (2009). The Parties maintain that it does not. Instead, the *Ricci* standard applies where an employer seeks to upset legitimate expectations for use of an already established selection process by invalidating past test results to avoid possible disparate impact liability. *See id.* at 584. The *Ricci* Court did not question the permissibility of "an employer's affirmative efforts to ensure that all groups have a fair opportunity to . . . participate in the process by which [selections] will be made." *Id.* at 585. Because the Decree contains requirements to ensure that an employer's future hiring cycles provide such opportunity and comply with Title VII, the standards described above apply.

11

settlement, a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility." *Am. Canoe Ass'n v. U.S. Env't Prot. Agency*, 54 F. Supp. 2d 621, 625 (E.D. Va. 1999) (internal quotation marks omitted) (quoting *Bragg v. Robertson*, 54 F. Supp. 2d 653, 660 (S.D. W. Va. 1999)); *see also Maryland v. GenOn Ash Mgmt., LLC*, 2013 WL 2637475, at *1 (D. Md. June 11, 2013) ("[W]hen a settlement has been negotiated by a specially equipped agency, the presumption in favor of settlement is particularly strong.") (citation omitted).

## B. The Consent Decree Is Fair, Adequate, Reasonable, and Consistent with Federal Law.

The Court should provisionally approve and enter the Decree because its terms are fair, adequate, and reasonable, and are not illegal, a product of collusion, or against the public interest. *See Wilbon*, 633 F.3d at 311 (quoting *North Carolina*, 180 F.3d at 581). The Parties, represented by competent and experienced counsel, in possession of ample information about the United States' claims, have weighed the United States' likelihood of success on the merits and agree that the relief the Decree provides is adequate and offers the best path forward for resolution of this case. *See Carson,* 450 U.S. at 88 n.14; *see also North Carolina*, 180 F.3d at 581.

### 1. The United States Is Likely to Succeed on the Merits.

The United States brought this lawsuit under Section 707 of Title VII, 42 U.S.C. § 2000e-6, which authorizes the Attorney General to bring an action against a state or local government employer engaging in a pattern or practice of discrimination in violation of

12

Title VII.[3] Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). This disparate impact theory was codified by Congress and ensures the removal of "employment procedures or testing mechanisms that operate as 'built-in headwinds' for [protected] groups and are unrelated to measuring job capability." *Id.* at 432. For example, testing devices used to screen potential employees are unlawful under Title VII if they disproportionately exclude African-American candidates compared with their white counterparts, and the test is shown to be unrelated to measuring the candidates' job capabilities. *See id.*; 42 U.S.C. § 2000e-2(k).

In the Fourth Circuit, to establish a prima facie case of disparate impact discrimination, a plaintiff must demonstrate that a specific employment practice causes "racially disparate results." *Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015) ("*Brown II*"). To make this showing, the United States must identify the specific employment practice it challenges and demonstrate causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Walls v. City of Petersburg*, 895 F.2d 188, 191 (4th Cir. 1991) (citations omitted); *see also Axel v. Apfel*, 171 F. Supp. 2d 522, 526 (D. Md. 2000). The evidence

---

[3] The same statutory provision expressly grants the district courts jurisdiction over such suits. 42 U.S.C. 2000e-6(b) ("The district courts of the United States shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section . . . .").

13

necessary to meet this standard must show that a disparity in outcomes between groups is statistically significant, as measured by at least two to three units of standard deviation. *Brown II*, 785 F.3d at 908; *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.14 (1977) (indicating that anything greater than two or three standard deviations in racial discrimination cases is suspicious); *Brown v. Nucor Corp.*, 576 F.3d 149, 156 n.9 (4th Cir. 2009) ("*Brown I*") (applying the *Hazelwood* standard to plaintiffs' statistical evidence). At this level of statistical significance, the probability that the disparity in outcomes is a result of chance is less than five percent. *See Equal Emp't Opportunity Comm'n v. Am. Nat'l Bank*, 652 F.2d 1176, 1190–93 (4th Cir. 1981) (discussing the meaning and use of standard deviation analysis). This disparity raises "an inference of causation." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988).

If this case proceeded to trial, the United States would have to establish a prima facie case of discrimination by showing that Durham's uses of the CEB had a statistically significant disparate impact on African-American applicants. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i). Here, based on comprehensive data regarding Durham's uses of the CEB, the United States determined—and the Parties stipulate—that when aggregating data for the years since 2015, African-American applicants (1) passed the written examination at a statistically significant lower rate than white applicants; and (2) were offered interviews based on their CEB score at a statistically significant lower rate than white applicants. *See* Ex. A ¶¶ ix.–x. Both disparities were statistically significant at more than three units

14

of standard deviation, providing sufficient evidence of causation. *See id.*; *Brown II*, 785 F.3d at 908. Thus, if this case proceeded to trial, the United States' evidence would support a prima facie case of disparate impact.

Once the United States has established a prima facie case, the City must prove that its uses of the CEB are "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). In other words, if the written examinations "cannot be shown to be related to job performance, the practice is prohibited." *Griggs*, 401 U.S. at 431–32. The Supreme Court has further explained that "discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975) (citation and internal quotation marks omitted). To make this showing, the employer must demonstrate that the employment test has been validated through a professionally acceptable methodology, *i.e.*, a validity study. *See* 29 C.F.R. § 1607; *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 n.7 (4th Cir. 1971).

Here, the United States asserts that the City cannot show that its uses of the CEB are job related and consistent with business necessity. *See* Ex. A ¶¶ xii.–xiii. In making this assertion, the United States relies on experts in the field of industrial and organizational psychology, who assessed the validity evidence in support of the CEB that Durham produced during the United States' investigation and would testify, if the case

15

were litigated to conclusion, that such evidence is insufficient to support Durham's uses of the CEB. While Durham does not admit liability under Title VII and contends its selection and use of the CEB was based on its belief that the CEB was job-related and consistent with business necessity, for purposes of settlement only, the City stipulates that it cannot currently demonstrate that its uses of the CEB are job related and consistent with business necessity. 29 C.F.R. § 1607.15(A)(3). Consequently, Durham cannot demonstrate that the written exam meets the requirements of Section 703(k) of Title VII, 42 U.S.C. § 2000e-2(k).

Even if the United States' case is likely to succeed on merits, protracted litigation and trial would impose substantial risks and costs on both Parties, which further supports the reasonableness of approving a mutually agreeable settlement. As a general matter, Title VII disparate impact cases are complex and time-consuming—they routinely span several years, and proceedings are often bifurcated for separate trials on liability and damages. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 361 (1977). Litigation here would necessarily involve extensive discovery, in-depth statistical analyses of the adverse impact of the written exam, in-depth analyses of the development and predictive capacities of the written exam, and in-depth data-based estimates of monetary damages, all provided in expert reports and examined in lengthy depositions. Such inquiries routinely lead to extensive motions practice. Not only would such litigation be costly for both Parties, but each Party also recognizes the risk inherent in

16

trial of such claims. The Parties' voluntary Consent Decree avoids these costs and risks, ensures timely relief to affected individuals, and allows DFD's hiring to proceed on surer footing than it otherwise could while litigation is pending.

Thus, the likelihood of the United States' success on the merits and the complexity, expense, and likely duration of litigation all support provisional entry of the Decree.

2. *The Consent Decree Provides Relief that Is Adequate and Appropriate Under Title VII.*

Once courts have assessed the plaintiff's likelihood of success, they then consider whether the relief secured by the settlement is adequate. *Carson,* 450 U.S. at 88, n.14; *see also North Carolina*, 180 F.3d at 581. Courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co.*, 422 U.S. at 418 (citation omitted). The relief the Decree provides accomplishes both of these goals by: (1) ensuring that the City will replace the CEB with a New Selection Device that complies with Title VII and does not unnecessarily exclude qualified African-American applicants from employment; and (2) providing individual relief to those individuals who otherwise may have been eligible for hire as Firefighters but for use of the CEB. The relief is within the range of potential recovery if this matter had been litigated to conclusion and represents a reasonable compromise of the United States' claims.

First, the injunctive relief in the Decree is appropriate. When an employer has

17

engaged in a pattern or practice of discrimination in violation of Title VII, an award of injunctive relief is justified without any further showing. *See Int'l Bhd. of Teamsters*, 431 U.S. at 361. Appropriate injunctive relief may include an order prohibiting an existing discriminatory practice; an order for the adoption of new, lawful selection procedures; or "any other order necessary to ensure the full enjoyment of the rights protected by Title VII." *Id.* (internal quotations omitted). Accordingly, the injunctive relief in the Decree provides for the cessation of the current practices alleged by the United States to constitute a pattern or practice of discrimination. Specifically, the Decree enjoins the City from continuing to use the CEB and requires the City to develop and administer a New Selection Device that complies with Title VII to replace the CEB. *See* Ex. A ¶¶ 34, 40–51.

Second, the individual relief in the Decree is appropriate. One of the central purposes of Title VII is to make whole persons who have been harmed by employment practices that violate the statute. *See Albemarle*, 422 U.S. at 418. In enacting Title VII, "Congress took care to arm the courts with full equitable powers" so that the courts may fashion relief for identifiable victims of unlawful employment practices. *Id.* In exercising these equitable powers, a court may fashion relief "as may be appropriate, which may include, but is not limited to . . . hiring of employees," with monetary and other equitable relief as the court deems appropriate. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (quoting Section 706(g) of Title VII, 42 U.S.C. § 2000e-5(g)). In Title VII pattern

or practice cases, the goal is to place affected individuals at, or as near as possible to, the situation they would have been in but for the challenged practices. *Albemarle*, 422 U.S. at 418–19 (citation omitted). Guided by these principles, courts have routinely approved settlements that include "the three basic components of 'make whole' relief in hiring discrimination cases: a job offer, backpay, and retroactive seniority." *See Wrenn v. Sec'y, Dep't of Veterans Affairs*, 918 F.2d 1073, 1076 (2d Cir. 1990); *United States v. Massachusetts*, 869 F. Supp. 2d 189, 191–92, 196 (D. Mass. 2012).

The individual relief here is consistent with the make-whole relief authorized by Title VII. Individuals affected by the City's uses of the CEB are eligible for monetary payments and the opportunity to compete for a priority hire position. *See* Ex. A ¶ 52. The amounts of both monetary and priority hiring relief the Decree provides are premised on an estimate of the "hiring shortfall" caused by Durham's uses of the written exam—*i.e.*, the number of additional African-American applicants who would have been hired absent the discriminatory effect of the written exam. The monetary relief of $980,000 is substantial and will provide claimants with some measure of financial restitution, even though it is less than what the United States could recover if it prevailed at trial.[4]

---

[4] The United States sought back pay damages dating back two years from the date Durham was notified of the United States' investigation in February 2020—thus, the claimed damages began accruing in February 2018, even though Durham began using the CEB in 2015. The Parties agreed to the amount of the Settlement Fund after consideration and discussion of several factors, including the estimated "hiring shortfall" discussed above, the value of the wages and benefits Firefighters earned during the relevant time frame, estimates of expected mitigation, litigation risk, and the benefit of

Moreover, the method for apportioning the monetary relief and the Decree's other requirements ensure that no claimant receives back pay in excess of the claimant's make whole relief. *See id.* ¶¶ 66, 92. The Decree also provides that the City will select up to 16 priority hires. *See id.* ¶ 104. The number of priority hires does not exceed the estimated hiring shortfall caused by the challenged employment practices. And the retroactive seniority and hiring bonuses that Durham will provide to priority hires under the Decree represent an attempt, to the extent possible, to put claimants who could have been hired sooner but for DFD's uses of the written exam in the position they would have been in but for the practices challenged in this case to achieve the make whole purpose of Title VII. *See Franks*, 424 U.S. at 764–65. Finally, again, the Decree limits all relief to identified individuals affected by the City's challenged hiring practices—*i.e.*, those who were disqualified from further consideration in the selection process as a result of the written exam.

Thus, the relief the Decree provides make it fair, adequate, and reasonable. *See Wilbon*, 633 F.3d at 311 (citation omitted).

       3.     *The Stage of the Proceedings, the Absence of Collusion, and the Experience of Counsel Support Approval of the Consent Decree.*

First, the extent of the pre-discovery information that the Parties have exchanged supports the fairness of the Decree and its provisional approval. As noted above, the

---

settlement to claimants.

United States commenced its investigation of DFD in early 2020. The Parties have now spent over four years exchanging and analyzing information related to DFD's hiring process, including the written test and its policies regarding compensation, benefits, and seniority, as well as engaging in discussions about the factual and legal issues that ultimately formed the basis of the United States' Complaint. Since January 2024, the Parties have engaged in good-faith settlement discussions and arms-length negotiations. At this stage, each party is thoroughly aware of the strengths and weaknesses of its evidence, arguments, and assertions, having evaluated the statistical evidence and other factual information to determine the benefits and risks of settlement versus trial. This history favors approval of the Decree.

Second, the experience of counsel who negotiated the Decree further supports that the Decree is fair, adequate, and reasonable. *See North Carolina*, 180 F.3d at 581 (quoting *Carson*, 606 F.2d at 430). Counsel handling negotiations for the United States are experienced and well-versed in the issues of this specific litigation as well as Title VII enforcement cases generally. *See id.* (quoting *Carson*, 606 F.2d at 430). Indeed, the Decree is the product of an investigation conducted by a federal agency with responsibility to the public interest and expertise in Title VII, expertise and responsibility to which the Court may afford "substantial weight." *Am. Canoe*, 54 F. Supp. 2d at 625 (citing *Bragg*, 54 F. Supp. 2d at 660). Similarly, the City is represented by experienced counsel, and the Decree has been approved by the Durham City Council after substantial

21

discussion.

For these two reasons, the Court should also conclude that the Decree was not a product of collusion.

        4.     *The Consent Decree Provides for Two Hearings to Ensure Fairness and Promote Transparency.*

Finally, the Decree's provisions for two fairness hearings further support the fairness of the Decree. Both fairness hearings comport with the provisions of Title VII that protect a consent decree under the statute from collateral attack while addressing due process concerns. Under Section 703(n)(1) of Title VII:

> [A]n employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under . . . Federal civil rights laws may not be challenged . . . by a person who, prior to the entry of the judgment or order [had] actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and . . . a reasonable opportunity to present objections to such judgment or order[.]

42 U.S.C. § 2000e-2(n)(1).

The Decree's notice requirements and objection procedures meet the requirements of this provision. Prior to the Fairness Hearing on the Terms of the Consent Decree, the claims administrator or the City will provide persons whose interests may be affected by the Decree with notice of both the Decree and the Fairness Hearing on the Terms of the Consent Decree, and they will have the opportunity to object. Ex. A ¶¶ 21, 23–27, 28. Additionally, the Decree requires broad publication of the existence and specific terms of

the Decree. The Fairness Hearing on the Terms of the Consent Decree gives this Court the opportunity to consider any objections and satisfy itself that the terms of the Decree are fair, adequate, and reasonable. *Id.* ¶ 32.

Prior to the Fairness Hearing on Individual Relief, relevant individuals will receive notice of the hearing and of what individual remedial relief, if any, may be awarded, as well as instructions for filing objections to the proposed relief. Ex. A ¶ 72. The Fairness Hearing on Individual Relief gives this Court the chance to consider any objections and ensure that the awards are fair, equitable, and free of error. *Id.* ¶ 81.

Thus, the notice provisions in the Decree weigh in favor of the Decree's provisional approval and entry as fair, adequate, and reasonable.

## VI.    CONCLUSION

For the above reasons, the Parties respectfully request that the Court: (1) provisionally enter the proposed Decree; (2) set the time, date, and location of the Fairness Hearing on the Terms of the Consent Decree, no fewer than 130 days after provisionally approving the Decree; and (3) stay all deadlines pending the Court's determination as to whether to enter the Decree as a final order.

23

Dated: October 7, 2024

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

SANDRA J. HAIRSTON
United States Attorney
Middle District of North Carolina

KAREN D. WOODARD
Chief
Employment Litigation Section

LYNNE KLAUER
Chief, Civil Division
Middle District of North Carolina

CLARE GELLER
Deputy Chief
Employment Litigation Section

*/s/ Emily Given*
EMILY GIVEN
NY Bar No. 5420211
ROBERT RICH
DC Bar No. 1016908
Senior Trial Attorneys
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 532-5696
(202) 598-9898
Emily.Given@usdoj.gov
Robert.Rich@usdoj.gov

*/s/ Rebecca A. Mayer*
REBECCA A. MAYER
TX Bar No. 24092376
Assistant United States Attorney
Middle District of North Carolina
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401
(336) 333-5351
rebecca.mayer@usdoj.gov

**FOR DEFENDANT CITY OF DURHAM, NORTH CAROLINA:**

KIMBERLY M. REHBERG
Durham City Attorney

*/s/ Sofia Hernandez*
Sofia Hernandez, NC Bar No. 46583
Deputy City Attorney
Office of the City Attorney

*/s/ Anne Marie Tosco*
Anne Marie Tosco, NC Bar No. 48118
Senior Assistant City Attorney
Office of the City Attorney

101 City Hall Plaza, Suite 2200
Durham, North Carolina   27701
Telephone: (919) 560-4158
Facsimile: (919) 560-4660
sofia.hernandez@durhamnc.gov

*/s/ Sarah Laws*
Sarah Laws, NC Bar No. 57971
Associate City Attorney
Office of the City Attorney
101 City Hall Plaza, Suite 2200
Durham, North Carolina   27701
Telephone: (919) 560-4158
Facsimile: (919) 560-4660
sarah.laws@durhamnc.gov

101 City Hall Plaza, Suite 2200
Durham, North Carolina  27701
Telephone: (919) 560-4158
Facsimile: (919) 560-4660
annemarie.tosco@durhamnc.gov

## <u>CERTIFICATE OF WORD COUNT</u>

I certify on this 7th day of October, 2024, that this Memorandum complies with the word count limit set forth in Local Rule of Civil Practice 7.3(d). The number of words in this Memorandum, exclusive of the caption, signature lines, certificate of service, and any cover page or index, according to the word count feature of the word processing software used to prepare the Memorandum, does not exceed 6,250 words.

*/s/ Emily Given*

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2024, I electronically filed the foregoing

Memorandum in Support of Joint Motion for Provisional Approval and Entry of Consent

Decree using the Court's CM/ECF system, which will send notification of such filing to

all counsel of record.

*/s/ Emily Given*