# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 1:24-cv-838 |
| CITY OF DURHAM, NORTH CAROLINA, | |
| Defendant. | |

## BRIEF REGARDING APPLICABILITY OF *RICCI v. DESTEFANO* TO MOTION FOR PROVISIONAL APPROVAL AND ENTRY OF CONSENT DECREE

# TABLE OF CONTENTS

I.   Introduction .............................................................................................. 1

II.  The Court should apply the standard from *United States v. North Carolina* to the parties' Joint Motion ............................................................................... 2

    A.    *North Carolina* is binding on this Court, and its standard has been widely and uniformly applied to motions for entry of a consent decree even after *Ricci*. ................................................................................................... 3

    B.    Applying the *Ricci* standard here would disregard important differences in the procedural postures of *Ricci* and *Brennan* as compared to the present case. ..................................................................................................... 4

    C.    Applying the fair-and-reasonable standard permits a court to ensure that there is a strong case of disparate impact liability before third-party interests are affected. ................................................................................... 8

    D.    At a minimum, *Ricci* does not apply to the parts of the consent decree providing for the formation of a new test. ................................................. 10

III. Even if the *Ricci* standard applies, the parties more than satisfy it. ....................... 12

    A.    There is a strong basis in evidence to support the United States' prima facie case of disparate impact discrimination. ..................................................... 13

    B.    There is a strong basis in evidence that Durham could not show that its uses of the Comprehensive Examination Battery (CEB) are job-related and consistent with business necessity. ............................................................. 14

        1.    Durham did not follow FPSI's recommendations ███████████ ████████████████████████████████████ .......... 17

        2.    Durham did not conduct a suitable job analysis ............................... 20

        3.    The CEB is not representative of the job of firefighter .................... 22

    C.    There is a strong basis in evidence that the relief in the consent decree is well within the bounds of what a court might impose after a finding of liability ...................................................................................................... 25

        1.    The proposed consent decree provides for the kinds of relief that courts have found necessary to address Title VII disparate impact violations. ......................................................................................... 25

2.      Courts follow the same approach as in the proposed consent decree when determining who is eligible for relief and to what extent....... 26

3.      The relief in the proposed consent decree would not unfairly harm third parties...................................................................................... 31

IV.     Conclusion .......................................................................................... 32

# I. Introduction

During a hearing on the parties' joint motion for provisional approval of a consent decree (ECF No. 2, "Joint Motion"), this Court requested further briefing on the applicability of the strong-basis-in-evidence standard established in *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009), and applied in *United States v. Brennan*, 650 F.3d 65 (2d Cir. 2011). *See* Minute Entry (Dec. 16, 2024) and Hearing Transcript at 57.

As discussed below, binding Fourth Circuit precedent requires the Court to apply the fair-and-reasonable standard articulated in *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999), and not *Ricci*'s strong-basis-in-evidence standard ("*Ricci* standard"). *Ricci* and *Brennan* are procedurally distinct from this case, and neither conflicts with this binding precedent. Approving a consent decree with prospective remedies is materially different than evaluating a disparate treatment claim resulting from an employer's unilateral decision that upset its employees' settled expectations. At the same time, the fair-and-reasonable standard guards against many of the same concerns as the *Ricci* standard, permitting the Court to ensure that Durham does not unnecessarily interfere with third party interests in an effort to remedy a disparate impact.

But this Court need not decide whether the *Ricci* standard applies because even if it does, the parties more than satisfy it. There is a strong basis in evidence to believe that Durham used a firefighter hiring test that had a statistically significant adverse impact on African-American candidates. Likewise, there is a strong basis in evidence to believe that this test failed to meaningfully or validly distinguish between candidates who are and

1

are not able to perform successfully in the firefighter position—especially given Durham's choice not to follow its test developer's recommendations regarding how to use the test. There is thus a strong basis in evidence that Durham's uses of this invalid hiring test violated the disparate impact prohibition in Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(k). Finally, there is a strong basis in evidence to believe that the relief provided in the consent decree is well within the bounds of a what a court might award after a finding of liability on this disparate impact claim.

Given that the parties satisfy both the *Ricci* and fair-and-reasonable standards, the Court should grant the Joint Motion and provisionally approve the consent decree.[1]

## II. The Court should apply the standard from *United States v. North Carolina* to the parties' Joint Motion.

The Court is bound by Fourth Circuit precedent to apply *North Carolina*'s fair-and-reasonable standard when deciding whether to enter the consent decree in this case, 180 F.3d at 581, and neither *Ricci* nor *Brennan* upend this precedent. In *North Carolina*, the United States sued the State because it found that the North Carolina Department of Corrections engaged in a pattern or practice of sex discrimination against female correctional officers. *Id.* at 578. The United States and North Carolina moved the district court to enter a consent decree resolving the United States' claims. The consent decree included, among other things, priority hiring and priority promotion relief for female

---

[1] Though not a signatory on the instant brief, Durham concurs that whether the Court applies the fair-and-reasonable standard or the strong-basis-in-evidence standard, either standard is met by the evidence presented. However, Durham reserves its right to contest specific factual allegations herein if the consent decree is not approved.

2

claimants harmed by the discriminatory practices. *Id.* The district court declined to approve the consent decree, and the Fourth Circuit reversed. In reaching this decision, the Fourth Circuit held that courts faced with a motion to approve a consent decree should apply the well-established standard that requires them to determine whether the consent decree is "fair, adequate, and reasonable" and not "illegal, a product of collusion, or against the public interest" ("fair-and-reasonable standard"). *Id.* at 581 (citation omitted). The Court should apply the fair-and-reasonable standard here for several reasons.

### A. *North Carolina* is binding on this Court, and its standard has been widely and uniformly applied to motions for entry of a consent decree even after *Ricci*.

Trial courts in the Fourth Circuit, even after *Ricci*, have applied the fair-and-reasonable standard, articulated in cases like *North Carolina*, when they consider whether to approve Title VII consent decrees that include relief similar to the relief in the proposed consent decree here, including priority hiring relief. *See, e.g.*, Exhibit 3 (*United States v. Md. Dep't of State Police*, 1:24-cv-2862 (D. Md. Nov. 8, 2024)); *United States v. Balt. Cnty., Md.*, 19-CV-2465, 2021 WL 2000480, at *4 (D. Md. May 19, 2021).

Having conducted thorough research, the United States is unaware of any district or appellate court that has applied the *Ricci* standard in a decision on a motion for the entry of a consent decree to resolve a Title VII disparate impact case such as this one.[2]

---

[2] In *United States v. New Jersey*, 10-CV-91, 2012 WL 3265905, at *8 (D.N.J. June 12, 2012), some individuals who objected to the decree argued that the *Ricci* standard should

3

Indeed, in the sixteen years after *Ricci* and fourteen years after *Brennan*, district courts have consistently applied the fair-and-reasonable standard to such motions.[3]

The one court of which the United States is aware that expressly considered this issue decided that the fair-and-reasonable standard, not *Ricci*, applied. *Bazile v. City of Houston*, 858 F. Supp. 2d 718, 760–61, 760 n.23 (S.D. Tex. 2012). In reaching this decision, the *Bazile* court found the distinction between its procedural posture and *Ricci*'s dispositive:

> Here, the issue is not whether the City may take an adverse employment action [that may constitute disparate treatment, as in *Ricci*.] The issue is whether the court can approve a consent decree . . . based on the evidentiary record the parties have presented. *Ricci*'s 'strong basis in evidence standard' is not applicable.

*Id.*

### B. Applying the *Ricci* standard here would disregard important differences in the procedural postures of *Ricci* and *Brennan* as compared to the present case.

The *Ricci* and *Brennan* decisions were made in the context of disparate treatment cases addressing what the courts described as voluntary, unilateral employer action, whereas the parties here propose that Durham will act only after the Court ensures that a

---

apply. The court did not decide whether *Ricci* applied because it determined that, even if it did apply, the United States could meet the *Ricci* standard. *Id.* at *17.

[3] *See, e.g.*, *United States v. Pennsylvania*, 14-CV-01474, 2021 WL 6197382, at *2 (M.D. Pa. Dec. 31, 2021); *United States v. Rhode Island*, 14-CV-78, 2018 WL 2175557, at *1 (D.R.I. May 11, 2018); Exhibit 4 (*United States v. City of Lubbock*, 5:15-cv-234-C (N.D. Tex. Nov. 4, 2016)); Exhibit 5 (*United States v. City of Austin*, 1:14-CV-00533-LY (W.D. Tex. Nov. 7, 2014), at 21); *United States v. Massachusetts*, 869 F. Supp. 2d 189, 192–93 (D. Mass. 2012).

4

likely case of disparate impact liability exists and after a consent decree is entered.

In *Ricci*, the City of New Haven, Connecticut, administered written and oral tests for promotion to captain and lieutenant positions in its fire department. *Ricci*, 557 U.S. at 562. After announcing that White candidates passed the tests at a substantially higher rate than African-American candidates, New Haven declined to certify the test results because of a fear that, due to the racial disparities, doing so would violate Title VII's disparate impact provision. Consequently, none of the candidates who took the tests could be promoted. Seventeen White candidates and one Hispanic candidate sued New Haven alleging, among other things, that by declining to certify the test results, New Haven discriminated against them because of their race in violation of Section 703(a)— the disparate treatment provision of Title VII, 42 U.S.C. § 2000e-2(a). *Id.* at 574–75.

The Supreme Court held that New Haven violated Section 703(a) of Title VII when it discarded the test results based on racial disparities. Specifically, the Court held that after an employer has administered a test to candidates who have legitimate expectations about the way the employer will use the test, the employer may not voluntarily make race-conscious alterations to the test results to avoid a violation of Title VII's disparate impact provision (42 U.S.C. § 2000e-2(k)) unless the employer has a "strong basis in evidence" to believe that reliance on the test results would subject it to disparate impact liability. *Ricci*, 557 U.S. at 585.

The *Ricci* Court did not decide whether courts should apply the strong-basis-in-evidence standard when they consider motions for entry of consent decrees because New

5

Haven had not been sued, let alone had it agreed to a consent decree, when it discarded the test results. Indeed, in *Ricci*, New Haven acted absent three crucial circumstances present here: (i) No neutral investigative body dedicated to the protection of the public interest, like the U.S. Department of Justice, had determined that New Haven's fear of disparate impact liability was reasonable; (ii) No lawsuit alleging disparate impact liability had been filed; and (iii) No court had ordered through a consent decree that New Haven take the action at issue after determining that a strong case of disparate impact liability exists. The Parties here propose that Durham will implement the remedial measures in question only after all three of these conditions are met.

In *Brennan*, White male employees of the defendant, City of New York, argued that the defendant's unilateral implementation of disputed portions of a settlement agreement—the relevant terms of which had not been ultimately approved or ordered by the district court, *see* 650 F.3d at 118—constituted disparate treatment against them on the basis of their race. *Id.* at 70–72. In its opinion, the Second Circuit did not consider whether the district court should have entered the settlement agreement as a consent decree because that issue was moot at the time the Second Circuit was addressing the disparate treatment claim. *Id.* at 91–92. The court explicitly noted that it was "not deciding whether the district court's long ago decision not to approve the disputed portions of the settlement agreement and enter them as a consent decree was proper, in whole or in part." *Id.* at 92. Rather, the *Brennan* court held that to support the defendant's decision to unilaterally implement the portions of the agreement in question,

6

without the approval of the court, the defendant would have needed to satisfy the *Ricci* standard and have a strong basis in evidence to fear disparate impact liability. *Id.* at 109–17.

The *Brennan* court expressly distinguished its posture from one where parties are requesting a court to approve a consent decree: "[W]hatever standard applies in a case . . . in which a court is deciding whether to approve a settlement or to enter it as a consent decree is not germane to this case . . . ." *Id.* at 117. It clarified further: "[W]e do *not* mean to suggest that the authority of a court to *order* an employer to do something . . . is coterminous with an employer's power to do that same thing *voluntarily* without violating [Title VII's disparate treatment provision]." *Id.* at 99.

In light of these crucial procedural differences, application of the *Ricci* standard here would significantly muddle the legal landscape. While a consent decree admittedly differs from an adjudicated order following a trial, where the court makes findings of fact and conclusions of law, it also differs from a voluntary decision based on a mere fear of liability. Because a consent decree is different from an adjudicated order following a trial, it is appropriate for there to be some degree of scrutiny as to the merits of the case it resolves (as the fair-and-reasonable standard requires, as is discussed further below). But the *Ricci* standard applies at the other end of a spectrum, where an employer acts unilaterally and in the absence of a court order, based solely on a (potentially baseless) fear of liability. Nothing in *Ricci* or *Brennan* requires that the *Ricci* standard be applied here, where the employment actions in question are proposed to be taken only after an

7

extensive neutral investigation, after the filing of joint stipulations (and now expert declarations) that the United States can, and Durham cannot, meet its burdens under the law, and after the court gives final entry to an order requiring that Durham takes these actions. These circumstances have far more in common with remedial action taken upon order after a trial than they do with the kind of voluntary action at issue in *Ricci* and *Brennan*. Applying the *Ricci* standard here would conflate circumstances that are meaningfully different and introduce uncertainty that does not currently exist as to what legal standard applies when a court decides whether to approve a consent decree.

### C. Applying the fair-and-reasonable standard permits a court to ensure that there is a strong case of disparate impact liability before third-party interests are affected.

While the fair-and-reasonable standard requires courts "to be guided by the general principle that settlements are encouraged," it also provides that courts should not "blindly accept the terms of a proposed settlement." *North Carolina*, 180 F.3d at 581. Even though "voluntary compromises of Title VII actions enjoy a presumption of validity," *Kirkland v. N. Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1128 (2d Cir. 1983), the fair-and-reasonable standard still affords several ways for courts to ensure that employers do not capitulate in the face of baseless disparate impact claims as a way to engage in disparate treatment.

First, as discussed in the Joint Motion, the fair-and-reasonable standard requires courts to consider the plaintiff's likelihood of success on the merits. ECF No. 3 at 10–11. Depending on the facts and procedural posture of a case, sometimes stipulations or

8

admissions by the parties will suffice for purposes of this factor.[4] Sometimes

declarations are submitted to demonstrate the plaintiff's likelihood of success.[5] But in

any case, the fair-and-reasonable standard allows a court to block an employer that wants

to use the settlement of a baseless disparate impact claim to engage in the type of

disparate treatment at issue in *Ricci* because the court must ensure that the parties'

decision to enter into the consent decree "represents a reasonable factual and legal

determination based on the facts of record, whether established by evidence, affidavit, or

stipulation." *United States v. City of Miami, Fla.*, 664 F.2d 435, 441 (5th Cir. 1981)

("*Miami II*").[6]

      Second, under the fair-and-reasonable standard, courts also consider any effect

that the consent decree might have on third parties' interests. *United States v.*

*Massachusetts*, 869 F. Supp. 2d 189, 195–96 (D. Mass. 2012) (retroactive seniority

provision in consent decree approved despite impact on third parties). Specifically, when

---

[4] *United States v. Balt. Cnty., Md.*, 19-CV-2465, 2021 WL 2000480, at *1, *6 (D. Md. May 19, 2021) (facts court considered were based on stipulations); *United States v. Michigan*, 16-CV-12146, 2021 WL 2253270, at *4 (E.D. Mich. June 3, 2021) (court considered only facts alleged in United States' complaint).

[5] *Pennsylvania*, 2021 WL 6197382, at *3 (court considered evidence submitted with summary judgment motions); *Massachusetts*, 869 F. Supp. 2d at 191 (same); Ex. 5, *Austin*, 1:14-CV-00533-LY, at 2 (court considered declarations in support of entry of consent decree).

[6] When considering whether to enter consent decrees in disparate impact cases, some courts have required a showing only on the plaintiff's prima facie case. *See Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1129–30 (2d Cir. 1983). Other courts also considered whether the challenged employment practice is job-related and consistent with business necessity and/or whether less discriminatory alternatives exist. *See Pennsylvania*, 2021 WL 6197382, at *3. It does not appear the Fourth Circuit has ruled on this issue.

the rights of third parties are at stake, courts applying the fair-and-reasonable standard ensure that the consent decree's effect on third parties is neither "unreasonable nor proscribed." *Miami II*, 664 F.2d at 441; *see also Durrett v. Hous. Auth. of City of Providence*, 896 F.2d 600, 604 (1st Cir. 1990) (relying on *Miami II*). This further enables courts to ensure that an employer does not rely on a baseless disparate impact claim for purposes of engaging in disparate treatment against third parties.

Third, the fair-and-reasonable standard requires a court to ensure that the settlement is not a product of collusion. ECF No. 3 at 10. This requirement too would allow a court to block the settlement of a disparate impact claim if the plaintiff and defendant both wanted to use the settlement of a baseless disparate impact claim to engage in the type of disparate treatment at issue in *Ricci*. There is no reason to think that collusion is an issue here since the decree resulted from arm's length negotiations among experienced counsel after a thorough examination of the evidence, as discussed in the Joint Motion. *Id.* at 20–22. Further, unlike a private plaintiff, the United States will not receive any pecuniary benefit from the settlement, which is why the normal presumption of validity of a Title VII settlement is even stronger when the United States is a party to the settlement. *United States v. City of Miami, Fla.*, 614 F.2d 1322, 1332 (5th Cir. 1980) ("*Miami I*").

> **D.     At a minimum, *Ricci* does not apply to the parts of the consent decree providing for the formation of a new test.**

Even if the *Ricci* standard applies, it does not require a strong basis in evidence before an employer can agree, as a prospective matter, to adopt a Title-VII-compliant

10

hiring process moving forward, as the decree here requires. ECF No. 2-2 ¶¶40–51.

The *Ricci* decision itself emphasizes that "Title VII does not prohibit an employer from considering, *before administering a test*," how best to design that test "to provide a fair opportunity for all individuals." *Ricci*, 557 U.S. at 585 (emphasis added). Such conduct is deeply distinguishable from the employer's actions in *Ricci*. There, New Haven's employment actions were taken in the face of legitimate expectations that it would do otherwise: New Haven discarded the results of tests it had already given, the results of which had been announced, and which it had planned to use in a specific anticipated way. As the Court noted,

> Examinations like those administered by the City create legitimate expectations on the part of those who took the tests. . . . [S]ome of the firefighters here invested substantial time, money, and personal commitment in preparing for the tests. . . . [And yet,] the firefighters saw their efforts invalidated . . . .

*Ricci*, 557 U.S. at 583–84. Similarly, in *Brennan*, the employment action at issue upset employees' existing expectations because it provided beneficiaries with *competitive* retroactive seniority benefits that directly impacted other employees. *Brennan*, 650 F.3d at 104–05.

Here, by contrast, no legitimate expectations are proposed to be upset. Durham has already hired firefighters from among the last group of applicants who took the challenged exam, and it has not administered any other exam since. And the retroactive seniority benefits provided by the decree here are exclusively non-competitive. *See infra* Section III.C.3. The test development provisions of the consent decree require actions

11

that could not be construed as disparate treatment in violation of Title VII; in contrast to the conduct in *Ricci* and *Brennan*, development of a test is not an adverse employment action that upsets legitimate expectations, and the relevant provisions explicitly require that the test ultimately adopted is Title-VII-compliant. The *Ricci* decision exempted this kind of conduct from the strong-basis-in-evidence standard and thus, even if the *Ricci* standard applies here generally, it does not apply to the test development provisions of the decree.

### III. Even if the *Ricci* standard applies, the parties more than satisfy it.

For the reasons discussed below, even if the *Ricci* standard applies here, the Court should provisionally approve and enter the consent decree because the parties more than meet it. Given this, the Court need not decide if the *Ricci* standard applies.

Under *Ricci*, there must be a strong basis in evidence that the employer violated Title VII's disparate impact provision. *Ricci*, 557 U.S. at 585. This requires that the employer have an "objectively reasonable basis to fear" disparate impact liability under Title VII. *Brennan,* 650 F.3d at 110–13. There must also be evidence to suggest "a court might well impose . . . a make-whole remedy equivalent or broader" than what the employer provides in a settlement. *Id.* at 110. Notably, to satisfy the *Ricci* standard, employers do not have to show that, absent the remedial measures they adopted, a court *actually* would have found them liable for disparate impact or that a court *actually* would have ordered them to implement the remedial measures they adopted. *Id.* at 114–16.

12

**A.     There is a strong basis in evidence to support the United States'
prima facie case of disparate impact discrimination.**

For purposes of its investigation, the United States retained an expert, Dr. Charles Scherbaum, who analyzed data that Durham produced, and he determined that Durham's pass-fail and ranking uses of its written test from 2015 to the present[7] each adversely impacted African-American candidates to a statistically significant extent.  Exhibit 1 (Scherbaum Declaration) ¶7.  Dr. Scherbaum concluded that White candidates' test scores were, on average, ten percentage points (out of 100) higher than African-American candidates' test scores.  *Id.* ¶8.  Consequently, African-American candidates were five times less likely to pass the written test and almost six times less likely to receive an interview as a result of their score on the written test.  *Id.*  The table below provides further detail.  *See id.* ¶¶9–10.

---

[7] Dr. Scherbaum found it appropriate to examine the impact of the Comprehensive Examination Battery (CEB) in the aggregate—that is, by considering applicants who applied during the entire relevant timeframe together, rather than year by year.  Exhibit 1 (Scherbaum Declaration) at Section III.B.  Beyond the statistical rationales for adopting this approach, Fourth Circuit precedent supports it, having held that, when possible, it is "highly preferable" to examine data in the aggregate because, by increasing the sample size, one can more readily determine if there is a pattern of discrimination.  *Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 336 n.17 (4th Cir. 1983); *see also Eldredge v. Carpenters 46 N. Cal. Cntys. Joint Apprenticeship & Training Comm.*, 833 F.2d 1334, 1339 n.7 (9th Cir. 1987); *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002).

13

| Applicant race | Percent of test-takers who failed the written test | Percent of eligible test-passers who were not invited to interview due to test score |
|---|---|---|
| African-American | 37% | 33%[8] |
| White | 11% | 14% |

The disparities between the percentages of African-American candidates and White candidates disqualified by Durham's pass-fail and ranking uses of the written exam are statistically significant at 9.33 units and 6.48 units of standard deviation respectively. *Id.* ¶11. This level of statistical significance more than meets the United States' burden under Title VII to establish a prima facie case. ECF No. 3 at 13–15 (discussing standard of proof for a prima facie case).

Given this, it was objectively reasonable for Durham to stipulate, as it did (ECF No. 2-2 at 2–4), that the United States could establish a prima facie case of disparate impact discrimination under the legal framework discussed in the Joint Motion, ECF No. 3 at 13–14.

> **B.** **There is a strong basis in evidence that Durham could not show that its uses of the Comprehensive Examination Battery (CEB) are job-related and consistent with business necessity.**

If a plaintiff establishes a prima facie case of disparate impact, the burden shifts to the defendant to show that the challenged employment practice is job-related and consistent with business necessity. *See* ECF No. 3 at 15. There is a strong basis in

---

[8] This figure differs by one percent from the figure pled in the United States' Complaint, ECF No. 1 ¶24. The difference results from updated analyses based on additional data that Durham provided the United States after the Complaint was filed.

14

evidence to believe that Durham could not meet this burden. That evidence is more fully

laid out in the attached declaration of Dr. Harold Goldstein, an Industrial Organizational

Psychologist retained by the United States to evaluate the validity evidence for Durham's

written test. *See* Exhibit 2 (Goldstein Declaration). And that evidence explains why

Durham stipulated (ECF No. 3 at 16) that it cannot now show that its uses of the test are

job-related and consistent with business necessity and thus cannot demonstrate that the

written exam meets the requirements of Section 703(k) of Title VII, 42 U.S.C. § 2000e-

2(k).

In disparate impact cases involving the use of employment tests, the employer

must establish that its use of the test is "valid" to prove that it is job-related and

consistent with business necessity. *United States v. Cnty. of Fairfax*, 629 F.2d 932, 932,

942–43 (4th Cir. 1980); *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 n.7 (4th Cir.

1971).[9] The EEOC's Uniform Guidelines on Employee Selection Procedures, 29 C.F.R.

§ 1607 *et seq.*, ("Guidelines"), provide technical standards that validity studies should

meet, and courts often rely on the Guidelines to assess disparate impact claims. *See*

*supra* note 9.

While it is important that testing professionals develop and validate tests, *United*

*States and Vulcan Society, Inc. et al. v. City of New York*, 637 F. Supp. 2d 77, 115

(E.D.N.Y. 2009) ("*Vulcan I*"), there are many cases where employers retained testing

---

[9] *See also Vanguard Just. Soc'y, Inc. v. Hughes*, 592 F. Supp. 245, 256–57 (D. Md. 1984)
("*Vanguard II*"); *Ernst v. City of Chicago*, 837 F.3d 788, 796 (7th Cir. 2016).

15

professionals and still could not meet their burden to show that their tests were valid.[10] The bare fact of having obtained a test from a professional company is therefore insufficient to satisfy an employer's burden, especially where, as here, the employer fails to follow the test developer's recommendations regarding how to use the test. *See infra* Section III.B.1.

There are three primary ways that an employer can validate an employment test

████████████████████████████████████████████████████

████████████████████████████████ Ex. 2 (Goldstein) ¶¶12–13. The Fourth Circuit and district courts within the Fourth Circuit have relied on cases from the Second Circuit when they analyze whether tests possess sufficient content validity to justify their use despite their discriminatory impact on protected groups. *Cnty. of Fairfax*, 629 F.2d at 943; *Vanguard II*, 592 F. Supp. at 256. The seminal case in the Second Circuit on this issue is *Guardians Association of the New York City Police Department v. Civil Service Commission of the City of New York*, 630 F.2d 79 (2d Cir. 1980).

In *Guardians*, relying on the Guidelines, the court established a five-part test for analyzing the content validity of an employment test: (1) "the test-makers must have conducted a suitable job analysis;" (2) "they must have used reasonable competence in

---

[10] *See, e.g.*, *United States and Vulcan Society, Inc. et al. v. City of New York*, 731 F. Supp. 2d 291, 308 (E.D.N.Y. 2010) ("*Vulcan III*"); *Arndt v. City of Colo. Springs*, 263 F. Supp. 3d 1071, 1078–83 (D. Colo. 2017); *Smith v. City of Boston*, 144 F. Supp. 3d 177, 200–12 (D. Mass. 2015); *Bradley v. City of Lynn*, 443 F. Supp. 2d 145, 172–75 (D. Mass. 2006); *Ernst*, 837 F.3d at 795–805.

16

constructing the test itself;" (3) "the content of the test must be related to the content of the job;" (4) "the content of the test must be representative of the content of the job;" and (5) "there must be a scoring system that usefully selects from among the applicants those who can better perform the job." *Vulcan I*, 637 F. Supp. 2d at 109.

There is a strong basis in evidence to believe that Durham cannot show that (a) its scoring system validly selects applicants who can better perform the job; (b) a suitable job analysis was conducted; or (c) the content of its test is representative of the content of the job.

       **1.**     **Durham did not follow FPSI's recommendations** ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Durham failed to follow two key recommendations from its test developer: first,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and

second, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

*Cutoff score*: Employers must adopt a scoring system based on an assessment of what effectively distinguishes applicants who can perform successfully on the job from those who cannot. There is no valid basis for the 70% cutoff score that Durham selected for its test. Even with a valid test, "it is the cutoff score that ultimately determines whether a person passes or fails" and a "cutoff score unrelated to job performance may well lead to rejection of applicants who were fully capable of performing the job." *Vulcan I*, 637 F. Supp. 2d at 123–24 (quoting *Guardians*, 630 F.2d at 105). Accordingly, an employer should set the cutoff score "by using a professional estimate of requisite

17

ability levels" for the job, or, "at the very least, by analyzing the test results to locate a logical break-point in the distribution of scores." *Id.* at 124 (cleaned up); *see also Green v. Town of Hamden*, 73 F. Supp. 2d 192, 200 (D. Conn. 1999) (court enjoined use of test because of invalid cutoff score).

In *Vulcan I*, the court held that the employer used an invalid cutoff score on its firefighter test, in part, because it did not base the score on a validity study or job analysis. *Vulcan I*, 637 F. Supp. 2d at 125. For one of the tests at issue in *Vulcan I*, the defendant selected the 70% cutoff score based on the default set by its civil service rules, in contravention of the warning in *Guardians* not to do that, and the court held that this basis was insufficient under the law. *Id.* at 124–25.

The available evidence suggests that Durham likely committed this same error of relying only on an administrative basis to set a cutoff score. *See* Ex. 2 (Goldstein) at Section V.e. ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████ Durham produced a document during the United States' investigation which implies that it may have chosen 70% because of its interpretation of a North Carolina state policy—the North Carolina Fire and Rescue Commission's Certification Board Policy and Procedure's Manual—similar to the civil service rule in *Vulcan I*. As an initial matter, it is not clear that this policy applies to hiring tests (as opposed to training academy graduation tests) in the first place. But even

18

if it does, as *Vulcan I* makes clear, relying on this policy alone does not amount to the kind of "professional estimate of requisite ability levels" or identification of "a logical break-point in the distribution of scores" that is required under the law. *Vulcan I*, 637 F. Supp. 2d at 123–24 (quoting *Guardians*, 630 F.2d at 105).

The available evidence suggests only one alternative basis for Durham's choice of a 70% cutoff score: the City may have considered what cutoff score on the CEB would predict a candidate's capacity to pass the Emergency Medical Technician (EMT) examination, which each firefighter must pass as part of academy training. Durham, however, did not produce any evidence that such an analysis was performed before it set the cutoff score, let alone that it adequately supported a 70% cutoff score in particular. Ex. 2 (Goldstein) ¶48. The City did produce the analysis of a Durham employee (not a test development professional) which attempted to draw a correlation between CEB scores and scores on the EMT examination. But the employee performed this analysis years after Durham started to use the 70% cutoff score; she concluded that 70% was *not* in fact the score that would distinguish candidates who were capable of passing the EMT test from those who were not; and the analysis itself was conceptually flawed in several significant ways. *Id.* Thus, even if this kind of rationale could in theory support an employer's choice of a cutoff score, there is no indication that the evidence Durham would need to mount such a defense is present here.

*Ranking*: Durham's use of the CEB to rank-order candidates for interviews also contravened both ███████████████████████████████████████████

19

and professional testing practice alike and was therefore not a valid basis for making job-related hiring decisions. *Id.* at Section V.e. Rank-ordering "based upon the results of an examination requires strong justification" because even if a test can make "gross distinctions" between candidates, that does not provide "confidence for inferring that one-point increments among" test takers are a "valid basis for making job-related hiring decisions." *Vulcan I*, 637 F. Supp. 2d at 128 (applying *Guardians*). Thus, to justify the rank-order use of a test, the professional test developer must conduct additional analyses beyond those that would support the pass-fail use of the test. *Id.* at 128–29; *Smith v. City of Boston*, 144 F. Supp. 3d 177, 208-09 (D. Mass. 2015). Otherwise, an employer has no valid basis to differentiate between, for example, a candidate who received an 80 on a test from a candidate who received an 81.

 Ex. 2 (Goldstein) at Section V.e. Without any valid basis, Durham ████████████████ chose to rank candidates based on their numerical test scores for purposes of selecting them for interviews.

### 2. Durham did not conduct a suitable job analysis.

The starting point for a validly developed test is a job analysis where testing professionals assess what work behaviors are important for successful job performance and those behaviors' relative importance. *Vulcan I*, 637 F. Supp. 2d at 110; *Vanguard II*, 592 F. Supp. at 258. A job analysis is important because the test developer must

20

understand what tasks, knowledges, skills, and abilities are important for the job before they can design a test that distinguishes between candidates who possess them and those who do not.  29 C.F.R. § 1607.14(C)(2)–(3); *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 113 F. Supp. 3d 663, 676–77 (S.D.N.Y. 2015).

Durham did not conduct a job analysis and, instead, it relied on ███████ ████████████████████████████████████████████████████████████████ Ex. 2 (Goldstein) at Section V.a.  There are sometimes substantial differences between firefighting jobs in different fire departments, and without a job analysis of the Durham Fire Department (DFD) firefighting job, Durham could not determine if its firefighting job materially differed from the ████ firefighter job.  *Id.*

For example, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████ *Id.*  By contrast, New York City conducted a job analysis of its firefighter position in 2010, and ██████████ did not make the list of important knowledges or skills there.  Exhibit 6 (FDNY Firefighter Test Development and Validation Report, *United States and Vulcan Society, Inc. et al. v. City of New York*, 07-cv-2067 (E.D.N.Y. Sept. 24, 2012), ECF No. 976-1) at 25–27; Ex. 2 (Goldstein) ¶27.

Without investigating whether there were important differences between the firefighter jobs at DFD and ████, Durham could not validly "transport" or adopt the validity evidence from ████ to support the validity of Durham's use of the CEB.  Ex. 2

(Goldstein) ¶28; *see also Lanning v. Se. Pa. Transp. Auth. (SEPTA)*, 181 F.3d 478, 492 n.18 (3d Cir. 1999) (finding that reliance on another jurisdiction's validity study was "misplaced" absent evidence that the jobs were comparable); *Vanguard Just. Soc'y, Inc. v. Hughes*, 471 F. Supp. 670, 730–32 (D. Md. 1979) ("*Vanguard I*") (finding that validity studies from other employers could not be used without establishing transportability consistent with the Guidelines).

FPSI also conducted ████████████████ almost two decades ago in 2007. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Most experts agree that validity studies should be conducted every five years. Ex. 2 (Goldstein) at Section V.c.; *see also Bradley v. City of Lynn*, 443 F. Supp. 2d 145, 172–73 (D. Mass. 2006) (finding a decade old validity report relying on data from another jurisdiction was outdated). FPSI's outdated analyses could not account for changes in the firefighting profession in the years since 2007.

### 3. The CEB is not representative of the job of firefighter.

The CEB is also flawed because even if a job analysis had shown that the DFD firefighter job was substantially the same as the ████ firefighter job, which it did not, the CEB covers an unreasonably narrow portion of ████████████████████████

████████████████████████████████████████████████████████

████ firefighter job. To satisfy the *Guardians* requirement of "representativeness," an employer must establish that, to the extent that they can be feasibly measured, the test

22

measures the important aspects of the job. *Vulcan I*, 637 F. Supp. 2d at 118. This requirement prevents, among other things, the "needless elimination of some significant parts of the job's requirements from the selection process entirely." *Id.* Furthermore, to satisfy the representativeness requirement, "the content of the test must be proportionately representative of the content of the job." *Vanguard II*, 592 F. Supp. at 265.

To illustrate, imagine a baseball team that drafts players based merely on their ability to run fast and without regard to their ability to hit, throw, and field their positions. Such a selection process would lack representativeness because it omits significant requirements of a baseball player's job. Relying on this kind of narrow selection process may well eliminate the candidates most likely to be home-run hitters and overall great contributors to the team.

In *Vanguard II*, the court held that the firefighter test at issue lacked representativeness because it did not measure certain important knowledge areas and weighted some knowledge areas too heavily. *Id.* at 266; *see also Vulcan I*, 637 F. Supp. 2d at 119–20 (test lacked representativeness because it did not cover important aspects of the job); *Smith*, 144 F. Supp. 3d at 207–08 (same).

The CEB suffers from these same defects. ████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

23

██████████████████████████████████████ Ex. 2 (Goldstein) ¶18. █████████████
███████████████████████████████████████████████████
███████████████████████ *Id.* ¶19. █████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████
██████████████████ *Id.* ¶¶19–20.

FPSI████████████████████████████████████████
████████████████████was methodologically inappropriate and inconsistent
with accepted professional standards and practices because it arbitrarily limited the
number of KSAPCs that the test measured. *Id.* at Section V.b. Indeed, some of the
KSAPCs █████████████ can and should be measured on a test for entry-level
firefighters. *Id.* ¶¶30–33. For example,█████████████████████████
██████████████████████████████████
██████████████████████████████████████
███████████████████████████████ *Id.* ¶18. Since at least
2012, the FDNY has used a test that measures this ability, in part, by showing test takers
a video of an individual giving instructions and then asking them questions about those
instructions. *See id.* ¶32; Ex. 6 (FDNY Report) at 35-39. Similarly, the FDNY test
included items that measured ███████████████████████████

24

[black redaction bar] *See* Ex. 2 (Goldstein) ¶33. Like [black redaction bar],

these personality traits can be, and often are, measured on entry-level hiring tests. *Id.* By

choosing candidates based on a narrow and unnecessarily skewed set of KSAPCs,

Durham has likely eliminated qualified applicants in its firefighter selection process.

Thus, for all the reasons discussed above, there is a strong basis in evidence,

consistent with Durham's own stipulation, that Durham cannot meet its burden to show

that its use of the CEB is job-related and consistent with business necessity. ECF No. 3

at 16.

> **C.    There is a strong basis in evidence that the relief in the consent decree is well within the bounds of what a court might impose after a finding of liability.**

The consent decree provides relief that is available and typically awarded under

Title VII. *See* ECF No. 3 at 17–20. As such, there is a strong basis in evidence that the

United States could recover at least this much relief if the case were to proceed to trial.

> **1.    The proposed consent decree provides for the kinds of relief that courts have found necessary to address Title VII disparate impact violations.**

Courts have routinely awarded back pay and priority hiring relief with retroactive

seniority to victims of the employer's discrimination. *See, e.g.*, *Guardians*, 630 F.2d at

106 n.24.[11] Along with the prospective test development provisions of the consent decree

---

[11] *See also United States and Vulcan Society, Inc. et al. v. City of New York*, 877 F. Supp. 2d 57, 62–66 (E.D.N.Y. 2012) ("*Vulcan V*"), *modified by* 905 F. Supp. 2d 438 (E.D.N.Y. 2012) ("*Vulcan VI*"); *Vanguard II*, 592 F. Supp. at 271–72.

25

discussed above, *see supra* Section II.D, which have similarly been approved as a routine matter, *Guardians*, 630 F.2d at 109,[12] these are the basic forms of relief in the proposed consent decree.

> **2.** **Courts follow the same approach as in the proposed consent decree when determining who is eligible for relief and to what extent.**

To determine who is eligible for back pay and priority hiring relief, courts have followed the approach in the proposed consent decree of first establishing the total amount of back pay and total number of priority hires the employer must provide and then establishing the eligibility criteria that claimants must meet to be entitled to such relief. *United States and Vulcan Society, Inc. et al. v. City of New York*, 877 F. Supp. 2d 57, 62–67 (E.D.N.Y. 2012) ("*Vulcan V*"); *Segar v. Smith*, 738 F.2d 1249, 1264–65, 1288–91 (D.C. Cir. 1984) (class-wide back pay award affirmed); *Hameed v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Loc. Union No. 396*, 637 F.2d 506, 519–22 (8th Cir. 1980) (same).

To determine the total award of monetary relief and priority hires, courts determine the number of applicants in the group that the employer discriminated against who, absent the discriminatory practice at issue, one would have expected to be hired. *Id.* at 520.[13] This is called the hiring shortfall. In calculating the hiring shortfall in a case

---

[12] *See also United States and Vulcan Society, Inc. et al. v. City of New York*, 681 F. Supp. 2d 274, 278 (E.D.N.Y. 2010) ("*Vulcan II*"); *Vanguard II*, 592 F. Supp. at 271.

[13] *See also United States and Vulcan Society, Inc.et al. v. City of New York*, 847 F. Supp. 2d 395, 409–16 (E.D.N.Y. 2012) ("*Vulcan IV*"); *Equal Emp. Opportunity Comm'n v. O &*

involving a discriminatory test, courts presume that candidates in the group discriminated against (here, African-American candidates) would have performed as well as the best performing group (here, White candidates) on the challenged test if the test had been nondiscriminatory. *Berkman v. City of New York*, 705 F.2d 584, 594–95, 595 n.13 (2d Cir. 1983).[14] The United States and Durham followed this approach to reach a compromise, reflected in the proposed consent decree, on the total amount of monetary relief and number of priority hires. *See* Ex. 1 (Scherbaum) at Section III.C.

In cases involving discriminatory hiring policies, courts have held that individuals in the protected group who were screened out by the discriminatory policies are presumptively entitled to back pay and priority hiring relief. *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 772 (1976); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 361–62 (1977); *United States and Vulcan Society, Inc. et al. v. City of New York*, 681 F. Supp. 2d 274, 283–85 (E.D.N.Y. 2010) ("*Vulcan II*"). It is an employer's burden to rebut this presumption with evidence that, absent the discriminatory policy, it still would not have hired the individual. *Id.* This presumption is particularly important when it is impossible to know for certain how individuals harmed by a discriminatory policy would have fared in a nondiscriminatory hiring process. Courts resolve that uncertainty against the employer because its discriminatory policy caused the uncertainty. *Vulcan II*, 681 F.

*G Spring & Wire Forms Specialty Co.*, 790 F. Supp. 776, 779–80 (N.D. Ill. 1992), *aff'd*, 38 F.3d 872 (7th Cir. 1994).
[14] *See also United States and Vulcan Society, Inc. et al. v. City of New York*, 637 F. Supp. 2d 77, 96–97 (E.D.N.Y. 2009) ("*Vulcan I*"); *United States v. Pennsylvania*, 14-CV-1474, 2017 WL 4354917, at *10 (M.D. Pa. Oct. 2, 2017).

Supp. 2d at 285 (citing *Cohen v. W. Haven Bd. of Police Comm'rs*, 638 F.2d 496, 502 (2d Cir. 1980)).[15]

Taking this presumption in favor of relief into account, it is appropriate to set relief eligibility criteria in a way that ensures claimants suffered harm from the discriminatory policy and would have satisfied the employer's other nondiscriminatory hiring criteria. *Vulcan V*, 877 F. Supp. 2d at 60–62. The parties took this approach in the proposed consent decree. The relief eligibility criteria in the consent decree ensure that claimants (i) are in the group discriminated against (African-American), (ii) were harmed by the challenged test, and (iii) met the nondiscriminatory minimum qualifications for the job. ECF No. 2-2 ¶¶61–63.

By agreeing to the terms of the consent decree, Durham has elected to forgo its opportunity to rebut the presumption in favor of relief as to eligible claimants by presenting individualized evidence that it still would not have hired them. This is reasonable, given that it is impossible to know how any of them would have fared if Durham had administered a valid nondiscriminatory test to them. For the reasons discussed above, a valid nondiscriminatory test may well have focused on different KSAPCs than the CEB, which ███████████████████████████████ ██ and failed to measure even the important KSAPCs of that job in a representative manner. *See supra* Section III.B.3. Thus, even individuals with low scores on the CEB

---

[15] *See also Equal Emp. Opportunity Comm'n v. Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus.*, 186 F.3d 110, 122 (2d Cir. 1999); *United States v. City of Miami*, 195 F.3d 1292, 1299 (11th Cir. 1999) ("*Miami III*").

28

may have scored much higher on a test which better represented the KSAPCs important to the DFD job.   Nor is there any feasible means of discerning how disqualified applicants would have performed on the later steps in Durham's hiring process, such as its drug screen.

Given this uncertainty, it is appropriate to award relief to all individuals who satisfy the eligibility criteria in the proposed consent decree and not to limit eligibility to candidates who scored at some minimal level of performance on the CEB, as the Court considered at the December 16, 2024 hearing.  As happens to be the case here, very few African-American candidates who failed the CEB scored exceedingly poorly.  *See* Ex. 1 (Scherbaum) ¶¶42–44.  But again, even those who did score poorly may well have passed a valid test and gone on to be hired had they not been disqualified by the CEB.  *See* Ex. 2 (Goldstein) ¶36.  There is thus no evidentiary basis for the Court to set a cutoff score for purposes of making individual relief determinations.

For these same reasons, many other courts have approved consent decrees that awarded claimants pro rata shares of monetary relief and the opportunity to participate in the priority hiring process if they were disqualified by a challenged employment test and met the minimum qualifications for employment at the time of their disqualification, without regard for how high they scored on the challenged test.  *See, e.g.*, Exhibit 7 (Am. Settlement Agreement, *United States v. Balt. Cnty., Md.*, 19-CV-2465 (D. Md. May 24,

29

2021), ECF No. 48) ¶¶59–63.[16]  Such distributions do not provide for more than make-whole relief since, as described above, the *total amount* of relief is based on an analysis of how many additional candidates in the protected group the employer would have hired absent discrimination.

Furthermore, although claimants who scored poorly on the CEB may be eligible to participate in the priority hiring process, none of these claimants will be hired as priority hires without passing all steps in Durham's new hiring process, including the new selection device that will be adopted under the decree.  ECF No. 2-2 ¶67.  Nor will the claimants who become priority hires receive more than make-whole relief in terms of retroactive seniority.  In determining the appropriate amount of retroactive seniority to award, courts determine when the claimant would have been hired had the employer's unlawful practice not disqualified them.  *Franks*, 424 U.S. at 767–68.  The consent decree meets this standard because it appropriately sets retroactive seniority based on the date Durham would have hired the priority hire had they not been disqualified by the written test.  ECF No. 2-2 ¶123.[17]

---

[16] *See also* Exhibit 8 (Settlement Agreement, *United States v. Rhode Island*, 1:14-cv-78S (D.R.I. Sept. 18, 2017), ECF No. 80-1) ¶¶48–52; Exhibit 9 (Consent Decree, *United States v. City of Lubbock*, 5:15-cv-234-C (N.D. Tex. May 26, 2016), ECF No. 19-1) ¶¶55–60; Exhibit 10 (Consent Decree, *United States v. City of Austin*, 1:14-CV-00533-LY (W.D. Tex. June 6, 2014), ECF No. 64) at 22, 28–29; Exhibit 11 (Settlement Agreement, *United States v. Massachusetts*, 1:09-cv-11623 (D. Mass. Feb. 10, 2012), ECF No. 144-2, 144-3) ¶¶17, 51, 57–66.

[17] This is another way this case differs from *Brennan.* The *Brennan* decision noted "it was unclear at the time of the City Defendants' actions, and it remains unclear today" who among the relief beneficiaries "was a victim of any disparate-impact discrimination that

### 3. The relief in the proposed consent decree would not unfairly harm third parties.

Under Title VII, the interests of third parties cannot overcome the presumption in favor of make-whole relief for victims of discrimination absent the existence of unusual circumstances because courts must award "the most complete relief possible." *Franks*, 424 U.S. at 764, 779 n.41 (cleaned up); *see also Kirkland*, 711 F.2d at 1126; *Massachusetts*, 869 F. Supp. 2d at 195–96. It is possible that if the consent decree is entered, some future firefighter candidates may have their appointment to DFD delayed because DFD hires priority hire candidates ahead of them. But that is typical in cases such as this and not an unusual circumstance. *United States and Vulcan Society et al. v. City of New York*, 905 F. Supp. 2d 438, 446 (E.D.N.Y. 2012) ("*Vulcan VI*") (objections to priority hiring relief overruled) and *Balt. Cnty.*, 2021 WL 2000480, at *6, *8 (objections to retroactive seniority awards for priority hires overruled).

Sometimes courts have found that an award of retroactive *competitive* seniority—such as seniority that determines which employees receive overtime opportunities—constitutes an unusual circumstance that warrants a limitation on make-whole relief to

---

might have occurred, and how much retroactive seniority was necessary to make such individuals whole." *United States v. Brennan*, 650 F.3d 65, 110 (2d Cir. 2011). Unlike *Brennan*, where not all the beneficiaries had taken the challenged examinations, here the consent decree limits eligibility for relief to individuals disqualified by Durham's test. *Brennan*, 650 F.3d at 79; ECF No. 2-2 ¶¶62–63. Additionally, unlike *Brennan*, where the awards of retroactive seniority arguably resulted in some beneficiaries receiving more than make-whole retroactive seniority, *Brennan*, 650 F.3d at 82, 110, 129, here retroactive seniority is provided dating back to the date when the claimant would actually have been hired if they had not been disqualified by the challenged exam, *id.* ¶123, ensuring no more than make-whole relief.

protect the rights of incumbent employees. *See, e.g.*, *United States v. City of Hialeah*, 140 F.3d 968, 983 (11th Cir. 1998). That is not a concern here because the proposed consent decree does not provide any competitive seniority, but only non-competitive seniority, which impacts the pay and benefits of the priority hires and no one else. ECF No. 2-2 ¶¶121–22. Thus, there are no unusual circumstances that overcome the presumption in favor of awarding the make-whole relief in the consent decree, including priority hiring relief.

## IV. Conclusion

The United States respectfully reiterates the Parties' request to provisionally approve the proposed consent decree.

Dated: January 15, 2025

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

KAREN D. WOODARD
Chief
Employment Litigation Section

CLARE GELLER
Deputy Chief
Employment Litigation Section

*/s/ Emily Given*
EMILY GIVEN
NY Bar No. 5420211
ROBERT RICH
DC Bar No. 1016908
Senior Trial Attorneys
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 532-5696
(202) 598-9898
Emily.Given@usdoj.gov
Robert.Rich@usdoj.gov

## <u>CERTIFICATE OF WORD COUNT</u>

I certify on this 15th day of January, 2025, that this Brief complies with the word count limit established by the Court. ECF No. 17. The number of words in this Brief, exclusive of the caption, signature lines, certificate of service, and any cover page or index, according to the word count feature of the word processing software used to prepare the Brief, does not exceed 9,000 words.

*/s/ Emily Given*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of January, 2025, I electronically filed the foregoing Brief using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Emily Given*