Exhibit 5

FILED

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2014 NOV -7  PM 12: 06

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

UNITED STATES OF AMERICA,           §
                    PLAINTIFF,      §
V.                                  §          CAUSE NO.  1:14-CV-00533-LY
                                    §
THE CITY OF AUSTIN, TEXAS,          §
                    DEFENDANT.      §
                                    §

<u>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND**</u>
<u>**FINAL ORDER APPROVING CONSENT DECREE**</u>

This matter came before the Court on October 29, 2014, for a Fairness Hearing and

hearing on the Joint Motion for Final Approval of the Consent Decree (Doc. #46), filed by

Plaintiff United States of America ("United States") and Defendant City of Austin ("City")

(collectively, the "Parties").  At the October 29 hearing, the Court heard presentations from the

United States and the City; legal counsel representing Local 975 of the International Association

of Firefighters ("Local 975") and 10 individual members of Local 975; and one other individual,

Brendan Flood.[1]  No other persons present at the October 29 hearing expressed an interest in

making a presentation to the Court.[2]

_____

[1]  Local 975 and the 10 incumbents who objected to the Decree also submitted a Response to the
Parties' Joint Memorandum in Support of Final Approval of the Decree and a declaration by Dr.
Winfred Arthur on October 29, 2014 (Doc. #61).  Because the Union and individual incumbents
are not parties to this case, they are subject to the Decree-imposed deadline for submitting
objections, which was September 29, 2014.  Thus, the brief and declaration are untimely.
Regardless of when these submissions were filed, the Court has considered them and is
approving the Decree nonetheless.

[2]  As more fully described below, individuals potentially interested in the Decree were given
notice of the October 29 Fairness Hearing by postal mail, email, and/or other means.  All
objectors present at the hearing were given the opportunity to participate and explain their

In addition to these presentations, the Court has received substantial evidence from the Parties and the objectors concerning the fairness, adequacy, and reasonableness of the proposed Consent Decree ("Decree").  These submissions include declarations from Dr. Bernard R. Siskin, Dr. David P. Jones, Dr. Winfred Arthur, and other individuals.  In addition, the Court has received and considered a total of 38 objections (Doc. #s 48-57) submitted under the notice provisions of the Decree.  Finally, the Court has reviewed the briefing submitted by the Parties and the materials submitted by the objectors, and has considered the other relevant portions of the record in this action.

Considering all of the evidence presented in support of and opposition to the proposed Decree, and the authorities and arguments presented by counsel for the Parties and the objectors, the Court makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

A. **Background of this Litigation**

1.      In April 2013, the United States notified the City that it had commenced an investigation into the entry-level hiring practices used by the Austin Fire Department ("AFD") in 2012 and 2013 (Doc. #5 at ¶ 6).

2.      Over the next five months, the City produced thousands of pages of information requested by the United States, engaged outside legal counsel and an industrial/organizational psychology expert, and conducted its own extensive review of the 2012 and 2013 AFD hiring

---

opposition to the Decree.  Only legal counsel for Local 975 and the 10 members of Local 975, and Mr. Flood, elected to do so.  Mr. Flood is a Caucasian male.

2

processes (Doc. #5 at ¶¶ 17-23).  The City provided the United States with all requested

documents and data in its possession during the investigation.

3.     At the time the United States commenced its investigation, the City was

conducting written and oral assessments of applicants as part of its 2013 entry-level hiring

process at AFD.  As a result of concerns expressed by the United States to the City about the

potential for disparate impact in that hiring process, the City elected in the summer of 2013 to

suspend the 2013 hiring process pending the outcome of the United States' investigation.

4.     In September 2013, the United States notified the City of the findings from its

investigation.  The United States advised the City that it found the City's use of

cognitive/behavioral test scores as a pass/fail device in its 2012 hiring process, and its rank order

practice of selecting applicants on the basis of their total scores (reflecting written test scores and

interview performance and, where applicable, additional military service points) in its 2012

hiring process, had a statistically significant adverse impact on African-American and Hispanic

applicants.  The United States also advised the City that it did not consider the information

provided by the City sufficient to establish that either the pass/fail use of the cognitive/behavioral

test or the rank order practice used in 2012 were defensible as job-related and consistent with

business necessity under Title VII.

5.     The United States further advised the City that it believed the rank order practice

(based on total scores reflecting written test and interview performance and, where applicable,

additional military service points) which the City intended to use in the 2013 hiring process

would have a statistically significant adverse impact on both African-American and Hispanic

applicants in that hiring process.  The United States also advised that the information it had

3

received from the City and its 2013 test developer did not demonstrate that the rank order

practice was job-related and consistent with business necessity under Title VII.

      6.     Based on these findings, the United States invited the City to engage in settlement

negotiations to resolve the alleged Title VII violations in the City's 2012 and 2013 hiring

processes at AFD.  While the City maintains that it has defenses to these alleged Title VII

violations, the City accepted the invitation from the United States to attempt to resolve the

claims. The City's decision to enter into settlement negotiations with the United States was based

on its assessment of the strengths and weaknesses of its potential defenses to the claims asserted

by the United States, as well as its need to hire additional firefighters as quickly as feasible.[3]

      7.     Over the following months, the United States and the City engaged in settlement

negotiations with the goal of determining whether the Parties could resolve the alleged Title VII

violations through a consent decree.  Both Parties were represented in these negotiations by able

and highly experienced legal counsel with significant experience in complex employment

discrimination litigation, including disparate-impact litigation and litigation involving testing and

other personnel-selection devices.

      8.     In addition to its negotiations with the City, the United States also had multiple,

extensive communications both in writing and in person with Local 975 concerning the terms of

the potential consent decree between the United States and the City.  When the United States and

the City had reached tentative agreement on key terms of the Decree, counsel for the United

---

[3] With regard to its need to hire additional firefighters, the City produced credible evidence, uncontested by either the United States or the objectors, of a serious, longstanding need to hire additional qualified firefighters.  As of the time the United States commenced its investigation in April 2013, there were 33 vacant firefighter positions in AFD (Doc. #47-11, p. 2).  As of October 10, 2014, shortly before the Fairness Hearing, the number of vacant firefighter positions in AFD had grown to 93, and was continuing to grow (*Id.*).  The City has commissioned no new firefighters since July 28, 2013 (*Id.*).

States, along with its industrial/organizational psychology expert, Dr. David Jones, traveled to Austin and met with representatives of Local 975, their legal counsel, and their industrial/organizational psychologist, Dr. Winfred Arthur (Doc. #5, pp. 30-33). As a follow up to that meeting, the United States provided Local 975 with the information and data used by the United States to arrive at its findings (*Id.*). After receiving that information from the United States, Local 975 provided written comments and requests for modifications to several items of the tentative agreement between the United States and the City. Some of Local 975's suggested changes were incorporated into the Decree, while others were not (*Id.*).

9.      In early 2014, the United States convened an all-day meeting in Austin, facilitated by an experienced mediator, at the specific request of Local 975. Local 975 representatives and their legal counsel, legal counsel for the United States from the U.S. Department of Justice, legal counsel for the U.S. Equal Employment Opportunity Commission, and representatives and legal counsel for the City all attended this meeting. During this meeting, the United States again heard Local 975's concerns and attempted to resolve them through negotiation (*Id.*).

10.     The United States and the City concluded their negotiations in May 2014 by agreement to settle all alleged violations of Title VII found by the United States in the 2012 and 2013 hiring processes. The Court finds that each of the Parties had adequate information necessary to make a reasoned, informed judgment about the alleged prospective worth of the claims asserted by the United States prior to entering into settlement negotiations.

11.     The terms of the Parties' agreement are set forth in the Decree for which the Parties now seek approval from this Court (Doc. # 5-1). The Parties were able to agree upon these terms only after vigorous, arms-length negotiations between their counsel. The Decree was

5

approved by both the United States and the Austin City Council prior to commencement of this action.

12.     On June 9, 2014, pursuant to Section 707 of Title VII, 42 U.S.C. § 2000e-6, the United States commenced this action against the City to enforce Title VII.  The United States' Complaint alleges that the City has engaged in unlawful employment practices by utilizing selection procedures that have the effect of depriving or tending to deprive African Americans and Hispanics of employment opportunities because of their race and/or national origin, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a) (Doc. #1).  The Complaint does not include any allegation of intentional discrimination (*Id.*).

13.     In its Complaint, the United States challenges two aspects of the 2012 selection process used by the City to screen and select entry-level firefighters:  (1) the City's use of a written examination – the NFSI[4] – as a pass/fail screening device ("2012 pass/fail practice"),[5] and (2) the City's certification of applicants for hire in descending rank order based on a combination of their scores on the NFSI and a structured oral interview ("SOI"), plus military points if applicable ("2012 ranking practice") (Doc. #1).

14.     The United States also alleged in its Complaint that the City's intended use of results of its 2013 firefighter selection process ("2013 process") would violate Title VII if the City used those results to hire firefighters (Doc. #1).  That intended use was to process applicants for further consideration for hire based on a combination of their scores on a different written

---

[4]  National Firefighter Selection Inventory.

[5]  The United States' challenge to the pass/fail practice includes two components -- the use of a nominal cutoff score of 70 on the NFSI to determine whether a candidate passed or failed the test, and the use of an effective cutoff score of 75.06 to determine whether a candidate who passed the NFSI could proceed to the 2012 SOI.

6

examination -- the NELF[6] -- with their scores on the 2013 SOI, which differed from the 2012 SOI, plus military points if applicable (Doc. #1).

15.     On the same day as the Complaint was filed, the Parties filed a Joint Motion for Provisional Entry of Consent Decree and Scheduling of the Fairness Hearing on the Consent Decree (Doc. #4).  In support of that motion, the Parties also filed a memorandum of law (Doc. #5), the proposed Decree itself (Doc. #5-1), and other supporting materials (Doc. #s 5-2 to 5-5). On June 11, 2014, the Court entered an order preliminarily approving the Consent Decree (Doc. #9).  On June 12, 2014, the Court entered an order scheduling the Fairness Hearing for October 29, 2014 (Doc. #13).

**B.     Notice of the Fairness Hearing**

16.     Beginning in August 2014, well in advance of the October 29, 2014 Fairness Hearing, the City commenced a notice process as prescribed by the Decree and in accord with Section 703(n) of Title VII, 42 U.S.C. § 2000e-2(n) (Doc. #47-1 at ¶¶ 6-9).

17.     Specifically, pursuant to Paragraph III.D.3 of the Decree, the City, with assistance from the claims administrator retained by the City as provided in the Decree, sent notice of both the Decree and the Initial Fairness Hearing, along with instructions for filing objections:

    a.   to each Claimant identified as preliminarily eligible for relief under Paragraph III.F.3 of the Decree;

    b.   to each applicant in the City's 2013 process who took and completed both the NELF examination and the 2013 SOI; and

    c.   to each Fire Cadet and Firefighter at the Austin Fire Department.

---

[6]  National Entry-Level Firefighter exam.

(Doc. #47-1 at ¶¶ 4-7).

18.     The City itself sent notice to Local 975 (Doc. #47-5 at ¶ 5).  The e-mailed and mailed notices provided a toll-free telephone number at the Department of Justice that interested individuals could call for information about objecting to the Decree (Doc. #47-1 at ¶ 9).

19.     In further compliance with the notice provisions set forth in Paragraph III.D of the Decree, the City provided a link on its public website to the Decree and its appendices (Doc. #47-5 at ¶ 7).

20.     The City also caused a notice of the Decree and the Fairness Hearing to be published in the Wednesday, Friday, and Sunday editions of the *Austin American-Statesman* on August 20, 2014 through August 24, 2014, over a month before the deadline for submitting objections.  The newspaper notice included a toll-free number for the Claims Administrator so that individuals who had not received objection forms could request them (Doc. #47-1, p. 4).

21.     Finally, the City made paper copies of the Decree available at the City Clerk's office for distribution to interested individuals (Doc. #47-5, p. 4).

22.     The substantial costs associated with all such notices have been paid by the City.

23.     The Court finds that the notice was reasonable, the best practicable notice under the circumstances of this case, and effective.

C.     **The 2012 Selection Process**

24.     In 2012, the City used a process to screen and select applicants for the position of fire cadet, which is the entry-level position in the AFD.  In that selection process, applicants who met the minimum qualifications set by the City were initially given two written examinations: the NFSI, which is intended to test cognitive and non-cognitive skills and abilities; and the

8

Integrity Inventory ("I2"), which is intended to test counterproductive work behaviors (Doc. #5 at ¶ 8).

25.     The NFSI was administered on a pass/fail basis, with a nominal cut-off score of 70 on the examination (Doc. #1).  The City invited only the top 1,500 scorers on the NFSI who also passed the I2 to proceed to the next step in the hiring process, which was the SOI used in 2012 (*Id.*).  No one who scored less than 75.06 on the NFSI proceeded to the next step (*Id.*).  As Dr. Jones explained in his declaration, this meant that 75.06 operated as an effective cutoff score on the NFSI because candidates who scored lower were eliminated from further consideration, even if they nominally passed the NFSI (Doc. #3-6 at ¶ 29).  Those who passed both written exams and the SOI were given composite scores made up of 2/3 SOI score and 1/3 NFSI score (Doc. #1).  The City then added military points where applicable to arrive at final scores, and placed applicants in descending rank order on a preliminary eligibility list based on these scores (*Id.*).

26.     The top group of candidates on the preliminary eligibility list was then given an additional battery of final pre-employment assessments, including a physical ability test, drug screen, background check, medical evaluation, and psychological evaluation (Doc. #1).  Those candidates who successfully passed each of these pre-employment assessments were placed in descending rank order on a final eligibility list based on their test scores computed as described above (*Id.*).

### i.     **Impact of 2012 Process**

27.     The City administered the NFSI in 2012 to approximately 1,114 white candidates, 328 African-American candidates, and 902 Hispanic candidates (Doc. #5-2 at ¶ 2).

9

28.     Dr. Siskin has averred that generally statisticians, testing experts, and social scientists consider a disparity to be statistically significant if the probability of the disparity occurring randomly is 5% or less (Doc. #5-2, p. 3).  That probability standard, according to Dr. Siskin, is equivalent to 1.96 units of standard deviation (*Id.*).  The more units of standard deviation there are the less likely the disparity is to have occurred by chance.

29.     The United States has presented credible evidence that African-American and Hispanic candidates obtained NFSI scores at or above 75.06 at statistically significantly lower rates than white candidates.  Its statistical expert, Dr. Bernard Siskin, concludes in his declaration that the disparity in effective pass rates between African-American and white candidates equates to 9.72 units of standard deviation (*Id.*).  Dr. Siskin also concludes that the disparity in effective pass rates between Hispanic and white candidates on the 2012 NFSI equates to 8.75 units of standard deviation (*Id.*)

30.      The United States has also presented credible evidence that the City's determination and use of final scores to certify candidates in descending rank order separately resulted in statistically significant disparate impact upon African Americans and Hispanics in 2012.  Dr. Siskin concludes in his declaration that African Americans and Hispanics who passed the NFSI received statistically significantly lower (*i.e.*, worse) ranks on eligibility lists than whites (Doc. #5-2).  Dr. Siskin's analysis of the City's ranking practice found that the mean scores achieved by African-American candidates were statistically significantly lower than those achieved by white candidates, with a difference equivalent to 5.05 units of standard deviation. Dr. Siskin's analysis of the City's ranking practice also found that the mean scores achieved by Hispanic candidates were statistically significantly lower than those achieved by white candidates, with a difference equivalent to 4.96 units of standard deviation (Doc. #5-2, p. 4).

10

31.     In comparing the actual ranks of the candidates, Dr. Siskin found that the African-American candidates were ranked statistically significantly lower than the white candidates with a difference equivalent to 4.18 units of standard deviation.  Also, Dr. Siskin found that the Hispanic candidates were ranked statistically significantly lower than the white candidates with a difference equivalent to 4.88 units of standard deviation.  (Doc. #5-2, p. 4).

32.     Dr. Siskin also examined the rates at which various groups were reached for processing for hire.  He found that the difference in the rates at which white applicants as compared to African-American and Hispanic applicants were reached for further processing were statistically significant, equivalent to 2.81 units of standard deviation (white vs. African American) and 2.04 units of standard deviation (white vs. Hispanic).

33.     While the City does not contest Dr. Siskin's statistical analysis, it challenges the practical significance of these disparities (Doc. #30 at ¶ 18).

34.     Dr. Siskin calculates that, absent the disparate impact of the City's selection process on a pass/fail and rank-order basis, an estimated additional 12 African Americans and 18 Hispanics would have been hired as entry-level fire cadets in Austin (Doc. #5-2, p. 5).

ii.     **Validity of the 2012 Selection Process**

35.     The United States has presented credible evidence challenging the job-relatedness and business necessity of the 2012 hiring process.  From his analysis, Dr. Jones concludes that the City has not shown that either its decision to invite only the top 1,500 NFSI scorers (who also passed the I2) to take the SOI assessment, or its decision then to use descending rank order to select applicants from eligibility lists, is sufficiently job-related or consistent with business necessity to comply with Title VII, based upon professionally accepted validation standards (Doc. #5-3 at ¶¶ 48, 53).  Dr. Jones also states that when the 2012 test developer conducted a

11

local criterion-related validity study of the NFSI in Austin, the developer found no meaningful relationship between NFSI scores and the job performance of incumbent Austin firefighters (Doc. #5-3 at ¶ 33).

36.     Dr. Jones also found that the NFSI was designed and previously criterion-related validated as a two-and-a-half hour examination, but the City inadvertently erred in its administration of the test by reducing the time limit to two hours (Doc. #5-3 at ¶ 42).  Based on his analysis, Dr. Jones credibly concluded that there is insufficient evidence of transportable criterion-related validity for the City's use of the NFSI in 2012 because of the administrative error (*Id.* at ¶ 43).  Dr. Jones also credibly concluded that the City's pass/fail use of the NFSI with an effective cut-off score of 75.06 did not distinguish meaningfully among those candidates who can be expected to perform the job of entry-level firefighter better, because the City, through the test developer, did not utilize a professionally appropriate method to establish that cutoff score (*Id.* at ¶¶ 44-48).

37.     Dr. Jones found that the national validation study report submitted by the 2012 test developer, I/O Solutions, Inc., reports that differences between the average scores achieved by City of Austin African-American, Hispanic, and white candidates were essentially equal in magnitude to those noted by the test vendor in testing nearly 17,000 candidates of the same ethnicities in other fire agencies where no evidence of time limit errors were noted (Doc. #47-10 at ¶ 33).  The I/O Solutions, Inc. national validation study shows adverse impact upon both African-American and Hispanic candidates in the group of more than 17,000 candidates similar to that noted by the City of Austin in 2012 (*Id.*).

38.     The City, on the other hand, contends that the 2012 hiring process was job-related and consistent with business necessity (Doc. #30 at ¶ 36).  The City contends that its test

12

developer—I/O Solutions, Inc., an industrial/organizational psychology consulting firm—and its organizational/industrial psychologist expert, Dr. Nita French, concluded that the I2 test was beneficial and defensible. The City argues that the I2 was shown to be sufficiently job-related for Austin firefighters, that local and archival criterion-related validation studies supported its use, and that published scientific literature confirms that integrity tests are valid predictors of job performance (Doc. #16-4 at ¶ 12). According to the City, in her report on the 2012 hiring process, Dr. French also concluded that the NFSI is a valid predictor of firefighter performance, both in the fire cadet academy training and on the job (*Id.* at 20). The City further contends that Dr. French also concluded that the 2012 SOI had many features of the best interview assessments, and that available evidence suggests that the interview was content valid and conducted appropriately (*Id.* at 22).

39.     In this lawsuit, the United States has neither challenged, nor conceded the validity of, the I2.

40.     The City contends that there are no less adverse, but equally valid, alternatives available to the 2012 hiring process (Doc. #30 at ¶ 36).

41.     The Court finds that resolution of these issues in the 2012 hiring process through contested litigation would likely require many months (or longer) of costly litigation, with substantial risks and expenses to both sides.

## D.     The 2013 Selection Process

42.     The 2013 selection process was underway when the United States notified the City of its investigation in April of that year. In 2013, the City used a different test developer and administered a different cognitive/behavioral test known as NELF, along with a different SOI (Doc. #5-3 at ¶ 54).

13

i.      **Impact of the 2013 Process**

43.     The United States has presented credible evidence that the NELF and 2013 SOI, in combination with the City's planned method of use, would result in statistically significant disparate impact against both African Americans and Hispanics based on the rank-order method that the City planned to use (Doc. #5-2, pp. 5-7).

44.     The City challenges the practical significance of the alleged disparity against both African-American and Hispanic applicants (Doc. #30 at ¶ 43).

ii.     **Validity of 2013 Process**

45.     The City contends that even if the planned use of the 2013 test would have resulted in adverse impact, the 2013 hiring process was job-related and consistent with business necessity (Doc. #30 at ¶ 44).  The City also contests the availability of less adverse, but equally valid, alternatives to the 2013 hiring process (*Id.* at ¶ 45).

46.     The City has presented evidence, supplied by its 2013 test developer, that the 2013 process was job-related and consistent with business necessity.  The United States contests the sufficiency of that evidence.  Dr. Jones explains that the validity of the 2013 NELF for the AFD is premised on the transportability of a validity study performed by the test developer for a fire department in an unnamed, midwestern city (Doc. #5-3, pp. 17-18).  Dr. Jones describes in his declaration the acceptable professional standards for transportability of validity studies as described in the *Uniform Guidelines on Employee Selection Procedures*, which is an accepted standard used by federal enforcement agencies (*Id.*).  He credibly concludes that the 2013 cognitive NELF test administered in Austin did not meet professionally acceptable standards for validity transportability because, among other things, the test as administered in Austin was not

14

the same test used for the underlying validation study in the unnamed midwestern city (Doc. #5-3 at ¶¶ 63-68).

47.     Using data provided by the City's 2013 test developer, Dr. Jones conducted his own criterion-related validity analysis of the 2013 NELF test used in Austin, and was able to find modest but incomplete evidence of validity (Doc. #5-3 at ¶¶ 73-76).  Based on that independent analysis, Dr. Jones also credibly concluded that the 2013 selection devices had an equally valid alternative use that would have resulted in less adverse impact (*Id.* at ¶¶ 77-82; *see also* Doc. #5-2 at ¶ 10).  Specifically, Dr. Jones found that retaining two of the five cognitive subtests on the NELF predicted job performance substantially as well as retaining all five subtests and with less adverse impact (Doc. #5-3 at ¶¶ 78, 82; Doc. #5-2 at ¶ 10).  Further, Dr. Siskin found that using the 2-part NELF instead of the 5-part NELF reduces adverse impact on African Americans and Hispanics to a statistically significant extent (Doc. #47-8 at ¶ 8).

E.     **Summary of Consent Decree**

48.     Under the terms of the Decree presented by the Parties, the City will adopt and administer a new, lawful procedure for selecting qualified applicants for entry-level firefighter positions, subject to review by the United States for compliance with Title VII during the term of the Decree (Doc. #5-1 at ¶ III.C.6).  The Court will resolve any disagreements between the Parties about a proposed procedure's lawfulness (*Id.*).

49.     To address the immediate hiring needs of the City, the Parties have agreed that the City may use the scores from the cognitive portion of the 2013 NELF test,[7] and the 2013 SOI

---

[7]  The decision to use all five subsections of the NELF test, rather than the two subsections identified by Dr. Jones, was a compromise made to address objections raised by the Union (Doc. #5, pp.30-32).

scores, weighted in the same manner as the original design of that hiring process (i.e., 80% weighting to the SOI, 20% weighting to the cognitive portion of the NELF, plus military points) to establish a list from which it may, but is not required, to fulfill exigent hiring needs by hiring up to 90 entry-level fire cadets (*Id.* at App. B, ¶ 6).

50.     The City will pay the gross sum of $780,000.00 in backpay to eligible Claimants. An individual is a Claimant eligible for backpay if he or she is African American or Hispanic, applied to be an entry-level fire cadet in Austin in 2012, was not hired, and either: (i) took and failed (with a score of less than 70) the 2012 NFSI but passed the I2; (ii) effectively failed the 2012 NFSI (with a score of less than 75.06) but passed the I2, or (iii) passed both the 2012 NFSI (with a score of at least 75.06), and the I2, but ranked too low to be selected for hire (*Id.* at ¶ III.F.3).

51.     Claimants who are eligible for backpay will receive a portion of the total backpay award, which is within the range of recovery based on the salaries that 30 entry-level firefighters would have received if they had been hired in 2012 absent disparate impact, reflecting mitigation (Doc. #5-2 at ¶¶ 13-14).  The total of 30 is derived directly from the estimated hiring shortfall from 2012 (18 Hispanics and 12 African Americans) (*Id.* at ¶ 13).  The $780,000 backpay settlement will be subject to payroll withholdings and distributed equitably among all eligible and interested Claimants, after a second fairness hearing on individual relief   (Doc. #5-1 at ¶ III.F.6.a).

52.     The Decree obligates the City to ensure that 30 priority appointments are made to 12 African-American and 18 Hispanic Claimants from the 2012 hiring process (Doc. #5-1 at ¶ III.F.5.d).  All Claimants who wish to compete for a priority appointment must successfully

complete the new, lawful selection procedure adopted by the City under the Decree, and pass all other standard AFD pre-employment requirements (*Id.* at ¶ III.C.6).

53.     Each Claimant who receives a priority appointment will be entitled to retroactive seniority dates, which will be the same as the dates the Claimants would have been hired and commissioned, respectively, but for the challenged practices that adversely affected the protected groups (*Id.* at App. A at ¶ 9).  These retroactive seniority dates are the same hire and commission dates awarded to the actual applicants who were hired in 2012, and thus are in the range of recovery the United States could obtain if it prevailed at trial.

## F.     Summary of Objections to the Decree

54.     The Court received a total of 38 separate objection forms, including several duplicates (Doc. #s 48-57).  Local 975 submitted objection forms on behalf of its president, Bob Nicks, and for the 10 individuals who earlier sought intervention in this lawsuit (these 11 objectors are collectively referred to as "Union Objectors") (*Id.*).  The 11 objections filed by the Union Objectors are identical in all relevant particulars, with the only difference being the contact information listed for the individuals (*Id.*).

55.     These 38 objections received fall within 10 different categories (Doc. #47-6):

     a.     The Union Objectors, in addition to three other objectors, allege that there is insufficient evidence of intentional bias, insufficient evidence of adverse impact, and/or that there is sufficient evidence that the entry-level firefighter written exam is valid;

     b.     The Union Objectors, as well as four other objectors, allege that, because the test(s) were fair in form, all applicants had a level playing field, and/or

because all applicants experienced the same treatment, the Parties cannot

justify the relief provided by the Decree;

c.      Three objectors assert that relief should be afforded to all applicants for

entry-level firefighter positions, not only African Americans and

Hispanics, and three raise concerns that they may no longer be eligible for

relief because of their age;

d.      One objector states that the Decree constitutes reverse discrimination;

e.      The Union Objectors, as well as two other objectors, argue that the Decree

will result in the hiring of unqualified individuals for entry-level

firefighter positions, and will, therefore, compromise public safety;

f.      The Union Objectors, along with one other objector, allege that African

Americans and Hispanics who receive priority hiring will be stigmatized

by their co-workers and superiors as a result of the Decree;

g.      The Union Objectors, plus one other objector, argue that the Decree

provides unearned seniority to priority hires;

h.      Seven objection forms are either blank or provide insufficient information

as to the nature of the objection;

i.      Four individuals appear interested in relief, which is not appropriate for

this phase of the litigation, but these individuals do not make any

objection to the Decree, and

j.      Six objection forms express support for the Decree and state no objection.

56.     The Court allowed those who objected to the Consent Decree and their counsel

who wished to be heard to explain the bases for their objections.

57.     On the basis of the foregoing, this Court finds that the Consent Decree is lawful, reasonable and equitable, and that the relief provided by it is adequate and sufficient.

## CONCLUSIONS OF LAW

58.     Any finding of fact stated above that should be denominated a conclusion of law shall be deemed to be a conclusion of law.  Likewise, any of the following conclusions of law that should be denominated a finding of fact shall be deemed a finding of fact.

59.     The Court has jurisdiction over this civil action, the settling Parties in this action, and the subject matter of this action.  Venue is appropriate in this judicial district.

60.     If an employment practice produces a statistically significant adverse impact based on the race or national origin among candidates for hire, then Title VII prohibits its use unless the employer proves that the device is "job-related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).  Courts typically accept, as sufficient to establish a *prima facie* case of disparate impact, disparities that are equivalent to two to three units (or more) of standard deviation.  *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n. 14 (1977); *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 279-80 (5th Cir. 2008).  Moreover, even if an employer can show that the device is job-related and consistent with business necessity, Title VII bars use of the procedure if there is an alternative employment practice with less disparate impact that will meet the employer's needs.  *See* 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

61.     Section 703(n) of Title VII protects a relief order from subsequent collateral attack by persons who had notice of the order and a reasonable opportunity to present objections to its terms.  *See* 42 U.S.C. § 2000e-2(n)(1)(A)(ii).

62.     The Court finds that the time period from the date notice was mailed to the objection deadline was fair, reasonable and sufficient for potential Claimants and other notified individuals to make a reasoned decision regarding the Consent Decree.  No one has claimed otherwise.  No objection received to date has been excluded from consideration as untimely. The Court further finds that the Fairness Hearing provided a fair, reasonable opportunity for all persons having knowledge of it to present objections to the Decree.  No one has claimed otherwise.

63.     The Court has considered the declarations and reports from Dr. Jones, Dr. Siskin, Dr. Arthur, and Dr. French, and has given them such weight as the Court deems appropriate and consistent with the facts and reasonable inferences from the facts present in this case.

## A. <u>Legal Standards for Evaluating Consent Decrees</u>

64.     "Voluntary settlement of Title VII suits was deliberately adopted by Congress as a means of accomplishing its goal of eliminating employment discrimination." *United States v. City of Miami* ("*City of Miami II*"), 664 F.2d 435, 442 (5th Cir. 1981).  Indeed, "'[c]ooperation and voluntary compliance were selected as the preferred means of achieving this goal.'"  *Id.* (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974)); *see also Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("In enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims.").

65.     As the Fifth Circuit has acknowledged, Congress places an "extremely high premium . . . on voluntary settlements of Title VII suits." *United States v. City of Miami* ("*City of Miami I*"), 614 F.2d 1322, 1331 (5th Cir. 1980), *modified per curiam*, 664 F.2d 435 (Former 5th Cir. Dec. 1981).  Thus, "Title VII consent decrees should be viewed in light of Congress' determination that voluntary compliance is a preferred means of enforcing nondiscriminatory

20

employment policies and practices." *Williams v. City of New Orleans*, 694 F.2d 987, 991 (5th Cir. 1983) (citation omitted).

66.     "In Title VII litigation, consent decrees enjoy a presumption of validity." *Id.* (citing *United States v. City of Alexandria*, 614 F.2d 1358, 1359, 1362 (5th Cir. 1980), overruled on other grounds implicitly by *Dean v. City of Shreveport*, 438 F.3d 448, 452 n.1 (5th Cir. 2006); *see also City of Miami I*, 664 F.2d at 440 (indicating that consent decrees in Title VII cases are presumptively valid) (citations omitted).  In particular, in cases where the United States is a plaintiff, that presumption "'is overcome only if the decree contains provisions which are unreasonable, illegal, unconstitutional, or against public policy.'" *Williams*, 694 F.2d at 991 (quoting *City of Alexandria*, 614 F.2d at 1362); *cf., E.E.O.C. v. Johnson & Higgins, Inc.*, No. 93 CIV 5481 LBS, 1999 WL 544721, at *3 (S.D.N.Y. Jul. 26, 1999) (well-settled that courts have limited role in reviewing proposed settlement agreements in litigation initiated by EEOC, which has responsibilities analogous to Department of Justice) (internal citation omitted).

67.     When assessing whether a proposed consent decree is lawful, reasonable and equitable, the Fifth Circuit considers several factors, commonly known as the *Parker* factors. *See Salinas v. Roadway Express, Inc.*, 802 F.2d 787, 789 (5th Cir. 1986) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (Former 5th Cir. 1982), *cert. denied*, 459 U.S. 828 (1982)); *see also San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 453 (W.D. Tex. 1999)).

68.     The *Parker* factors are:

(1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of litigation; (3) the stage of the proceedings and the actual amount of discovery completed; (4) the factual and legal obstacles to prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representatives and the absent class members.

21

*Salinas*, 802 F.2d at 789 (citing *Parker*, 667 F.2d at 1209).

69.     With respect to the *Parker* factors, the Court has weighed the benefits of the settlement against the prospect of the United States prevailing at trial and the potential range of recovery reasonably likely should the United States prevail.  The benefits conferred by the proposed settlement in this case are substantial.  For purposes of evaluating the fairness, adequacy, and reasonableness of this settlement, it is sufficient to state that recovery of any damages is not certain.  This uncertainty of recovery, coupled with the costs of proceeding against the City in what would no doubt be a complicated and extended process, weighs in favor of approving the settlement.

70.     The Decree is not the product of fraud or collusion.  The Court finds that the settlement discussions between the Parties preceding the filing of the Complaint were conducted in good faith and at arms-length.  "In the absence of fraud or collusion, the trial court should be hesitant to substitute its own judgment for that of counsel."  *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (analyzing lower court's approval of modified settlement in prison conditions case).  When "the parties engaged in a lengthy, arms' length settlement process," they satisfy the first *Parker* factor.  *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007); *see also San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 458 (W.D. Tex. 1999) (finding no fraud or collusion where the parties were "vigorously represented" and engaged in long-term, arms-length negotiations).

71.     The Court concludes that the United States has some likelihood, but not a certainty, of prevailing on the merits of its case, and that the City has some likelihood, but not a certainty, of sustaining its defenses to some or all of the claims in this case.  Based upon the record as a whole, including the submissions of the Parties and objectors at and after the October

22

29 hearing, the Court further concludes that both the United States and the City have good reason to seek a resolution of the issues in this case through a negotiated settlement. The Court concludes that the Decree-afforded relief strikes an appropriate balance between the strength of the United States' case and the uncertainty and delay inherent in contested and protracted litigation.

## B. Objections to the Decree

72.    The Court has duly considered the objections submitted in this case, and holds that they raise no genuine issue as to the fairness, adequacy, and reasonableness of the settlement and do not provide a reasonable basis to withhold final and complete approval of the Decree.

73.    Objections stating that there is insufficient evidence of intentional bias, insufficient evidence of adverse impact, and/or sufficient evidence that the hiring processes were valid are overruled (Doc. #47-6, p. 1).[8] A plaintiff need not establish discriminatory intent in a disparate impact case such as this,[9] and the existence of a liability dispute between the Parties is not a valid reason to withhold approval of the Decree. As indicated, the United States has presented significant evidence through its two experts to show a sufficient likelihood of success on the merits under *Parker*. The existence of a bona fide dispute is precisely why the two parties agreed, in arms-length negotiations, to the compromise settlement.

74.    The Court concludes that the City could not avoid liability here based on the Union Objectors' speculation that deviating from the test developer's recommended time limit resulted in at least some—if not all—of the adverse impact exhibited on the NFSI. Indeed,

_____

[8]  Objector Mr. Flood presents no viable legal claim or objection.

[9]  For this reason, the Court also overrules objections stating that the test was fair in form, all applicants had a level playing field, and/or all applicants experienced the same treatment.

23

courts have rejected the idea that an employer can rebut a *prima facie* case of disparate impact discrimination against a protected group merely by setting forth "some other facially non-discriminatory factor that correlates with disparate impact," to explain why the impact occurs. *See Bouman v. Block*, 940 F.2d 1211, 1228 (9th Cir. 1991).[10]

75.    Further undermining the position that adverse impact is attributable solely to the time limit error is Dr. Jones's finding that the national validation study report submitted by the 2012 test developer, I/O Solutions, Inc., reports that differences between the average scores achieved by African-American, Hispanic, and white City candidates were essentially equal in magnitude to those noted by the test vendor in testing nearly 17,000 candidates of the same ethnicities in other fire agencies where no evidence of time limit errors were noted (Doc. #47-10 at ¶ 33).  The I/O Solutions, Inc. national validation study shows adverse impact upon both African-American and Hispanic candidates in the group of more than 17,000 candidates similar to that noted by the City in 2012 (*Id.*).

76.    The Court overrules any objection comparing the racial representation in the Austin 2013 firefighter test passer population to the racial representation in the United States population.  According to Dr. Siskin, this analysis is statistically irrelevant to the issue of whether the 2013 test has an adverse impact (Doc. #47-8 at ¶ 11).  The Court finds that objections of this nature also ignore the fact that the United States alleges that the rankings themselves are adverse to African American and Hispanics and thus any adverse selection based on the rankings would not be attributable to chance (*Id.* at ¶ 12).

---

[10]  In the materials filed October 29, 2014, Union Objectors also seem to argue that rank/mean score analysis cannot be used to establish a *prima facie* case of adverse impact.  However, this very methodology was accepted in *United States v. City of New York*, 637 F.Supp.2d 77 at 86-7, 93 (E.D.N.Y. 2009).

77.    The Court overrules objections that the 2013 cognitive/behavioral test was designed to narrow the field of applicants to those who possessed the necessary skills to be firefighters.  The *Uniform Guidelines on Employee Selection Procedures* dictate that "non-empirical or anecdotal" assertions that an exam is representative of the job in question amount to an inappropriate "assumption of validity" that is insufficient to justify disparate impact.  *See* 28 C.F.R. § 50.14 (1978).  This type of objection also ignores the majority of the factors that an employer must prove in order to demonstrate the criterion-related validity of a selection procedure, and it ignores altogether both the validity problems that the United States has identified with regard to the 2013 process and the third prong of Title VII disparate impact analysis on alternatives.  Thus, objections of this nature are overruled.

78.    The Court finds that the City could not rebut the United States' *prima facie* case of disparate impact discrimination merely by setting forth "some other facially non-discriminatory factor that correlates with disparate impact," such as experience, education level, English-proficiency level or training level, to explain why the impact occurs.  *See Bouman*, 940 F.2d at 1227-28.  Nor can an employer rebut a showing of disparate impact by arguing that if the members of the protected group had only spent more time studying or practicing, for example, the challenged employment practice would not have had a disparate impact.  Thus, objections of that nature are overruled.

79.    District courts have "not merely the power but the duty to render a decree that will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future."  *Albemarle*, 422 U.S. at 418 (citation omitted).  Here, the relief provided in the Decree is narrowly tailored to accomplish this by:  (1) providing individual relief including backpay and/or priority hire positions to Hispanics and African Americans who are

25

part of the groups harmed by the challenged practices, and (2) ensuring through prospective injunctive relief that the City will develop and use a selection procedure that complies with Title VII and does not unnecessarily exclude qualified Hispanics and African Americans from the position of entry-level fire cadet.

80.     The Decree's prospective injunctive relief is justified without any further showing here. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 361 (1977).  Under the Decree, the City is required to adopt a new, lawful selection process for use in hiring entry-level fire cadets.  Courts have routinely entered consent decrees that, like the Decree here, afford such relief. *See, e.g., Vulcan Pioneers, Inc. v. New Jersey Dep't of Civil Serv.*, 832 F.2d 811, 816 (3d Cir. 1987) ("*Vulcan II*").  Appropriate prospective injunctive relief may include a bar against future discrimination, an order to maintain records and generate compliance reports, or any other directive that is "necessary to ensure the full enjoyment of the rights" Title VII protects. *See Teamsters*, 431 U.S. at 361.  Such relief may also include prohibiting the use of an unlawful exam or other invalid selection criteria, restricting the ability to promote from eligible lists shaped by unlawful selection practices, and ordering the adoption of new, lawful selection procedures. *See, e.g., Vulcan II*, 832 F.2d at 816 (affirming, in matter involving enforcement of consent decree, district court's prohibitions on using discriminatory exams and making promotions from lists generated by unlawful exams).

81.     Considering the nature of this litigation and the uncertainties surrounding it, disapproval of the settlement would jeopardize a substantial recovery for Claimants, increase costs for the City and the United States, and unnecessarily delay the hire of additional firefighters needed to address the growing shortage of critical public safety personnel in a growing metropolitan area.

26

82.     The Court overrules objections stating that the relief provided by the Decree is improper, inadequate, or constitutes reverse discrimination (Doc. 47-6, p. 1).

83.     In Title VII cases like this, "[t]he injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed." *Albemarle*, 422 U.S. at 418-19 (citation omitted).  Given these principles, courts have routinely entered consent decrees that confer the kinds of individual remedial relief included in this Decree – backpay, priority appointments, and full retroactive seniority to those receiving priority appointments. *See, e.g.*, *United States v. New Jersey*, Civ. No. 10-91 (KSH)(MAS), 2012 WL 3265905, at *1 (D.N.J. Jun. 12, 2012), *aff'd*, 522 F. App. 167 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 529 (2013); *United States & Corpus Christi Police Officers' Ass'n. v. City of Corpus Christi, Tex.*, 2:12-cv-00217 (S.D. Tex. May 16, 2013); *U.S. v. City of Portsmouth, Va.*, 2:09-cv-00133-MSD-FBS (E.D. Va. Jul. 23, 2009).

84.     The Court overrules any objection that the 2013 process is not the proper basis for any injunctive relief because no one has been hired from that process to date.  The alleged unlawfulness of the 2013 process, if implemented, supports the Decree's injunctive relief provisions, particularly those aimed at eliminating future Title VII-proscribed discrimination. Congress' preference for voluntary compliance and for settling Title VII claims further supports those provisions.  Moreover, given the broad equitable powers that courts have to eliminate future violations of Title VII, even if the 2013 process did not support those provisions, the alleged unlawfulness of the 2012 process supports the Decree's injunctive relief provisions.

85.     Objections concerning the distribution of the backpay settlement are overruled. Distributing the backpay amount among all eligible Claimants through the claims procedures under the Decree (as opposed to distributing the backpay only to the unidentified 30 individuals

27

who would ultimately be hired through the priority hiring process in the Decree) is equitable, and will provide those individuals with relief that is within the range of what they could recover if the United States prevailed at trial.  It is impossible to know exactly which 30 individuals would have been hired in 2012 in a Title VII-compliant process. A claims procedure to select them would be extremely time-consuming and expensive, and would require numerous speculative assumptions.  The Eleventh Circuit has explained "in the context of remedial backpay relief that a class-wide remedy is appropriate when fashioning an individualized remedy would create a quagmire of hypothetical judgments as to which individuals, out of a large class, should receive remedial relief." *United States v. City of Miami*, 195 F.3d 1292, 1299 (11th Cir. 1999) (internal quotations and citations omitted)*; see also Segar v. Smith*, 738 F.2d 1249, 1290 (D.C. Cir. 1984) (same); *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 261 (5th Cir. 1974) (same).  In addition, some individuals, including some of those who might have been hired at the time, may no longer be interested in employment at the Austin Fire Department.  Thus, to award the entire monetary amount to only 30 people would necessarily be both under-inclusive and over-inclusive, as well as inequitable.  Distributing the amount among all interested and eligible claimants is, therefore, a more equitable and efficient solution.

86.     The number of priority appointments is also within the range of recovery that the United States could obtain if it prevailed on the merits.  That number (30) is the same as the estimated number of additional African-American and Hispanic appointments that would have been made in the absence of the discriminatory employment practices (Doc. #5-2 at ¶ 8; *see also* Doc. #47-8 at ¶¶ 9-10).  Other courts have accepted this methodology in cases involving both consent decrees and litigated judgments. *See generally United States v. New Jersey*, Civ. No. 10–91 (KSH)(MAS), 2012 WL 3265905, at *12-13, 31 (D.N.J. June 12, 2012) (approving

28

consent decree); *United States v. City of New York*, 637 F. Supp. 2d 77, 94, 96-97, 132 (E.D.N.Y. 2009) (granting summary judgment to plaintiff).

87.     The Court overrules objections stating that the Decree will result in unqualified individuals becoming entry-level firefighters or otherwise compromise public safety, and similarly overrules objections stating that benefits conferred on Claimants are unearned or will stigmatize African Americans and Hispanics. No evidence was presented to the Court that supports these objections. Contrary evidence was presented, however. For example, under the terms of the Decree, the City will adopt a new, lawful selection procedure for entry-level firefighters (Doc. #5-1 at ¶ III.C.6). The Decree ensures that only Claimants who demonstrate that they are presently qualified for the position of entry-level fire cadet will be eligible for priority appointments (Doc. #5-1 at ¶ III.F.5.b; *see also,* App. E at ¶¶ 4-5).

88.     A Claimant will not be hired pursuant to the Decree unless, like every other Austin firefighter, the Claimant first demonstrates the qualifications to be an entry-level Austin fire cadet (Doc. #5-1 at App. E at ¶¶ 3-9). To do that, the Claimant must pass the newly adopted lawful selection procedure and must successfully complete all lawful steps in the hiring process that are in effect at the time (*Id.*). Those steps currently include an initial application screen for minimum qualifications, background investigation, physical ability test, drug test, psychological exam, medical exam, and treadmill test (*Id.* at ¶ 5). Further, in order to be commissioned as an Austin firefighter, a Claimant must also successfully complete the six-month cadet training academy. The Claimant is ineligible for retroactive seniority until completing the training academy and becoming commissioned as an Austin firefighter (Doc. #5-1 at ¶ III.F.5.g.ii).

89.     Further, retroactive seniority does not apply to time-in-grade requirements for promotions; thus, the Decree is narrowly tailored not to affect this provision of state civil service

law at all (Doc. #5-1, App. A at ¶ 9).   The Court finds no evidence that those hired pursuant to the Decree will not be qualified to be entry-level firefighters in Austin, nor is there any indication that those individuals will pose any unique risk to their colleagues or to the citizens they serve.

90.     The Decree appropriately provides retroactive seniority to Claimants who receive priority appointments (Doc. #5-1 at ¶ III.F.5.k).  Awarding retroactive seniority is a necessary element in placing qualified individuals – who, but for the challenged practices, would have been hired earlier – in the positions they would have occupied in the absence of the alleged discrimination.  Such retroactive seniority relief ordinarily is necessary to achieve Title VII's "make whole" objective.  *See Franks v. Bowman Transp. Co.*, 424 U.S. 747, 765 (1976); *U.S. v. New Jersey*, No. CIV. 88-5087 WGB, CIV. 88-4080(MTB), CIV. 87-2331(HAA), 1995 WL 1943013, at *19 (D.N.J. Mar. 14, 1995).  In fact, courts have found that there is a presumption in favor of affording such seniority relief when the parties reach a voluntary settlement.  *See Franks* at 780, n.41; *see also Moore v. City of San Jose*, 615 F.2d 1265, 1272 (9th Cir. 1980); *Bockman v. Lucky Stores, Inc.*, No. CIV S 83-039 RAR, 1986 WL 10821, at *4 (E.D. Cal. Aug. 11, 1986), *aff'd*, 826 F.2d 1069 (9th Cir. 1987).

91.     The Parties carefully tailored the Decree's retroactive seniority provisions to assure these terms would have limited, if any, impact on incumbent firefighters.  Under state civil service law, seniority based on the date of commissioning as a firefighter is one factor used in determining placement on a promotional eligibility list.  *See* Texas Local Government Code Sec. 143.033.  Only up to 30 individuals (those appointed as priority hires under the Decree) will receive retroactive seniority, with their seniority dates adjusted to the dates when they would have been commissioned had they been actually hired as part of the 2012 process (Doc. #5, pp.

27-28).  The Decree provides that half of the priority hires (15) will receive the same

commission date as the graduates from the earlier 2012 cadet academy, and half will receive the

same commission date as graduates from the later 2012 cadet academy (Doc. #5-1, App. A at ¶

9).  Thus, the Decree narrowly tailors retroactive seniority to closely replicate the seniority dates

the priority hires would have actually received had they been hired with those incumbents (Doc.

#5-1, App. A at ¶ 9(b)).

92.     Objections that the retroactive seniority provisions of the Decree will affect the

seniority rights of incumbent firefighters are overruled.  The retroactive seniority available under

the Decree is carefully limited to the actual hire and commission dates given to those hired in the

two 2012 fire cadet academies.  The number of priority hires is limited to the shortfall as

calculated by the United States' statistical expert (Doc. #5-2 at ¶ 8).  Importantly, as set forth in

this Court's prior rulings, AFD uses competitive seniority only in connection with promotions,

and any incumbent interest is both remote and speculative (Doc. #s 38 and 44).[11]  Thus, the

Court concludes that the rights of incumbents "are disrupted only to the limited extent necessary

to provide relief to identified victims."  *U.S. v. New Jersey*, Nos. CIV. 88-5087 WGB, CIV. 88-

4080(MTB), CIV. 87-2331 (HAA), 1995 WL 1943013, at *16 (D.N.J. March 14, 1995).

93.     There is no basis to believe that the retroactive seniority relief in the Decree will

stigmatize any of the priority hires.  In any event, that others may wrongfully stigmatize

---

[11] There also is the potential under state civil service laws to use competitive seniority during a
reduction in force, but the AFD has not had a reduction in force in more than 25 years, and the
City has indicated that it has a present need to address a significant and growing hiring shortage.
Thus, in light of the significant number of new hires contemplated by the City, it appears highly
unlikely that any current incumbent would even be reached in a future reduction in force, much
less selected for layoff in favor of a priority hire.  In addition, other seniority-based job benefits,
such as rate of pay and leave accrual rate, are individual benefits that do not affect incumbent
employees, so any objection to benefit seniority are overruled.

31

individuals is not a legitimate basis for denying final approval. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 511-12 (1986) (affirming approval of a consent decree over objections that the decree would cause "serious racial polarization"); *see also Franks*, 424 U.S. at 775 (concluding that relief cannot be denied "merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it") (citation omitted). Even if there was some plausible evidence of stigmatization from the retroactive seniority relief, that result standing alone is insufficient to prevent final approval of the Decree.

94.     In summary, the Court finds no basis to conclude that the priority hire and retroactive seniority provisions of the Decree will compromise public safety, or stigmatize or provide an unearned windfall to individuals hired through the priority hire process. To the contrary, the Court concludes that these provisions of the Decree achieve an appropriate balance between providing effective remedial relief under Title VII, and protecting the legitimate interests of the City and its existing firefighters.

## C.     No Requirement of a Merits Hearing

95.     Counsel for both the United States Department of Justice and the City are experienced and capable attorneys able to analyze in a realistic fashion the merits of their case, the prospects for recovery, the strategic implications of a settlement, and the value of a settlement, especially at this stage of the litigation. They recommend settlement, and their recommendation weighs in favor of approval under *Parker*.

96.     The continued litigation and trial of this action would be lengthy, complex, and extraordinarily expensive. Considering the nature of this litigation and the uncertainties surrounding it, disapproval of the settlement would jeopardize a substantial recovery for

Claimants, increase costs for the City and the United States, and unnecessarily delay the hire of additional firefighters needed to address the growing shortage of critical public safety personnel.

97.     When the parties are faced with the likelihood of a lengthy trial and extensive risks and costs, courts in this Circuit have found that the second *Parker* factor favors settlement. *San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio,* 188 F.R.D. 433, 458 (W.D. Tex. 1999) (repeating the court's statement at the fairness hearing that, "[t]he full litigation route [involves] risks and costs, not only monetary costs, but also damage to the department and to the city."); *see also Ayers v. Thompson,* 358 F.3d 356, 369 (5th Cir. 2004) (noting, in approving a Title VI and Equal Protection Clause settlement using the *Parker* factors, that settlement would provide relief for the class sooner than litigation would).

98.     The Court rejects the contention of the Union Objectors that there must be an adjudication of the merits of the United States' claims before the Court may approve the Decree. The cases relied upon by the Union Objectors are inapposite. They involve three narrow, inapplicable, exceptions to the traditional *Parker* analysis. These three exceptions are all based on factual settings not present in this case, as the Court has previously ruled in this case.

99.     The first exception, which is represented by *United States v. City of Miami,* 664 F.2d 435, 439 (5th Cir. 1981) (*en banc*), applies when a *party* withholds consent from a portion of a decree. But this exception does not apply, as this Court has twice denied Local 975 and its individual members party status in this action.

100.     The second exception, represented by *E.E.O.C. v. Safeway Stores, Inc.,* 714 F.2d 567, 575 (5th Cir. 1983), applies when a Decree conflicts with an *existing* collective bargaining agreement. This exception does not apply, as this Court has already determined that the Decree does not conflict with an existing collective bargaining agreement. Notably, the Fifth Circuit in *Safeway Stores* emphasized the general rule that merits adjudication is unnecessary:

33

We find that a district court can order that a party perform the promises it made in a conciliation agreement without an independent determination that discriminatory practices have, in fact, occurred. It would be manifestly illogical to recognize that Congress had selected conciliation as the primary means of achieving compliance with the Act, and at the same time to interpret the statute so that employers and unions are free to breach such agreements with impunity. If a trial *de novo* or a finding on the merits were required before any voluntary agreement to resolve discrimination claims could be enforced, conciliation agreements would be rendered worthless as a means of securing compliance with Title VII.

*Id.* at 575.

101.    Finally, the third exception, represented by *Overton v. City of Austin*, 748 F.2d 941 (5th Cir. 1984), applies when a Decree invalidates state law.  The most common example is a settlement following a constitutional challenge to a state law.  Before a Court can invalidate a state law, there must be a determination that it is in fact unconstitutional.  This exception likewise does not apply.  This Court has already determined, in denying intervention to the Union Objectors, that the Decree in this case does not invalidate any portion of the state Civil Service Act.

## ORDER

For all the foregoing reasons, this Court GRANTS the Joint Motion for Final Approval of the Consent Decree, and approves and orders the implementation of the Consent Decree according to its terms.

SIGNED

~~~~~~~~ this 7th day of _November_____, 2014.

_____
LEE YEAKEL
UNITED STATES DISTRICT JUDGE

34